## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **UNDER SEAL,** | § § § | **Case No. _____** |
| **Plaintiffs,** | § § | **SEALED DOCUMENT** |
| **vs.** | § § | **UNDER SEAL** |
| **UNDER SEAL,** | § § | **DO NOT PLACE IN PACER** |
| **Defendants.** | § § | **JURY TRIAL DEMANDED** |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel. Maria Del Carmen Gamboa Ferguson and Maria Del Carmen Gamboa Ferguson, Individually,** | § § § § § | Case No. _____ |
| | § § | **QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT** |
| **Plaintiffs,** | § § | |
| **vs.** | § § § | **FILED UNDER SEAL AND EX PARTE** |
| **Lockheed Martin Corporation,** | § § | **DO NOT PLACE IN PACER** |
| **Defendant.** | § § | **JURY TRIAL DEMANDED** |

## FILED UNDER SEAL

## QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT

## TABLE OF CONTENTS

I. SUMMARY ...........................................................................................1

II. PARTIES ..........................................................................................3

III. JURISDICTION AND VENUE.........................................................4

IV. FACTUAL ALLEGATIONS...............................................................4

    A. Relator Ferguson and the IA/SCA Group...............................4

    B. Global false Claims Act Violations........................................7

    C. The Specific Procurement Contract Fraudulent schemes ...................31

        1. TLMAL................................................................................31

            a. LMC and Its Subcontractor Co-Conspirator: TMLAL......32
            b. The TLMAL Procurement Contract at Issue .....................32
            c. The "Who, What, When, Where and How" of LMC's
                Fraudulent Inducement in Concert with TLMAL..............32

                i. LMC Fed TLMAL Fictitious Labor Hour Data.....34
                ii. LMC Initially Failed to Perform a TINA/FAR
                    Required Cost Analysis...........................................34
                iii. LMC Completed TINA-Certified PCAM Using
                    Known Fictitious TLMAL Labor Hour Data.........35
                iv. LMC Knew that TLMAL Possessed Real, Accurate,
                    Current and Complete Labor Hour Data, But
                    Refused to Request It from TLMAL or to
                    Modify the TINA/FAR Required Cost Analysis
                    Accordingly...........................................................35
                v. LMC "negotiated" the subcontract with TLMA,
                    Knowingly Including Fictitious TLMAL Labor
                    Hour Data, which TLMAL Falsely TINA Certified
                    to LMC as "Accurate, Complete and Current".....36

---

vi.    LMC Compiled and Submitted to the U.S.A. the Pretextual PNM and Included TLMAL's and its Own False TINA Certifications that the Information was "Accurate, Complete and Current"....................................................36

vii.   LMC Fraudulently Induced the U.S.A. To Enter the TLMAL Contract ...................................36

d.   The "Who, What, When, Where and How" of LMC's Fraudulent Overcharging Course of Conduct in Concert with TLMAL.......................................................38

**2. Esterline-Kirkhill**.................................................................**40**

a.   LMC's Subcontractor Co-Conspirator: Kirkhill................40
b.   The Kirkhill Procurement Contract at Issue ......................41
c.   The "Who, What, When, Where and How" of LMC's Fraudulent Course of Conduct in Concert with Kirkhill ...41

i.    The First Fraudulent Course of Conduct in Concert with Kirkhill.............................................42
ii.   The Follow-Up Fraudulent Course of Conduct in Concert with Kirkhill.............................................43

**3. Kongsberg Defense and Aerospace44**

a.   LMC and Its Subcontractor Co-Conspirator: KDA ...........45
b.   The KDA Procurement Contract at Issue ..........................45
c.   The "Who, What, When, Where and How" of LMC's Fraudulent Course of Conduct in Concert with KDA .......45

**4. Korean Aerospace Industries** ..................................................**48**

a.   LMC and Its Subcontractor Co-Conspirator: KAI.............49
b.   The KAI Procurement Contract at Issue............................49
c.   The "Who, What, When, Where and How" of LMC's Fraudulent Course of Conduct in Concert with KAI.........49

**5. Elbit Systems** ..........................................................................**51**

a.   LMC and Its Subcontractor Co-Conspirator: Elbit...........52

  b. The Elbit Procurement Contract at Issue ...........................52
  c. The "Who, What, When, Where and How" of LMC's
    Fraudulent Course of Conduct in Concert with KAI .........52

 **6. Aerospace Industrial Development Corporation ......................54**

  a. LMC and Its Subcontractor Co-Conspirator: AIDC ..........54
  b. The AIDC Procurement Contract at Issue .........................55
  c. The "Who, What, When, Where and How" of LMC's
    Fraudulent Course of Conduct in Concert with AIDC ......55

 **7. Additional Contract Proposals Lacking Cost Analyses
  and Fraudulently Induced ..........................................................57**

 **D. Laws Broken by LMC ........................................................................57**

**V. CAUSES OF ACTION ........................................................................58**

 **A. Count One – Violation of False Claims Act ..............................58**

**VI. JURY DEMAND ..............................................................................60**

**VII. PRAYER AND REQUEST FOR RELIEF ........................................60**

*QUI TAM* PLAINTIFF/RELATOR *MARIA DEL CARMEN GAMBOA FERGUSON* ("Ferguson"), brings this action on behalf and in the name of the United States of America ("U.S.A." or "the Government") and herself, individually, pursuant to 31 U.S.C. §§ 3729-3732 ("FCA") to recover all damages, penalties, incentives and other remedies available to the U.S.A. and Relator[1] under the FCA as a result of Defendant's unlawful conduct, as set forth below, and in support would show the following:

## I.
## SUMMARY

1.      Defendant Lockheed Martin Corporation, operating primarily through its "Lockheed Martin Aeronautics Company" division ("Defendant" or "LMC"), from at least 2010 through 2017, and in all probability through the date of this Complaint and continuing, knowingly violated the Truth In Negotiations Act ("TINA"), 10 U.S.C. § 2306(a) *et seq.* and 41 U.S.C. 2S4(b)(a)(2), and compliance requirements under Federal Acquisition Regulation, 48 CFR §§ 1.000 *et seq.* ("FAR"), section(s), such as § 15.404-3, regarding certified cost or pricing data in connection with multiple defense procurement contracts, including, but not limited to, the C130J Hercules Aircraft, the F-35 Joint Strike Fighter (JSF) Program, the F-22 Raptor and the F-16 Fighting Falcon. Specifically, LMC, through its Supply Chain unit and in its capacity as the prime contractor in each contract at issue herein, masterminded a staggeringly systematic and intentional scheme to defraud the U.S.A. At times LMC acted alone and at other times in combination with its subcontractors worldwide to violate (and then cover up the violations) mandatory cost

---

[1] To be clear and avoid confusion regarding Relator's "individual" standing, this action is brought on behalf of and in the name of the United States of America, with standing as its partial assignee pursuant to the *qui tam* provisions of the FCA. Upon successful resolution by trial or settlement, Relator and her attorneys, as her assignees, will seek to recover from Defendant her attorneys' fees, costs, and expenses incurred in bringing this action on behalf of the Government. Relator also seeks to be awarded a relator's share of any recovery obtained on behalf of the Government, as provided by the FCA.

disclosure requirements imposed by TINA/FAR so as to **(1)** induce the U.S.A. to agree to prime contracts and their attendant subcontracts at fraudulently inflated costs it otherwise would not have agreed to, and **(2)** pass through to the U.S.A. claims for payment that LMC knew were false and fraudulent while knowing its concurrent obligations to disclose the defective data to the U.S.A.

2.      The span of the repetitive pattern of LMC's actions, in collusion with its subcontractors across nearly a decade and multiple large procurement contracts covering several military programs, reflects that this was not a product of isolated silos of ignorance or mere reckless conduct. Rather, the reach of the pattern, coupled with admissions made by LMC management, confirms the reality that LMC exploited an opportunity to unlawfully increase profitability by conspiring with subcontractors to use **fictitious and inflated cost data and to otherwise knowingly conceal historical cost and pricing data that it and its subcontractors were required by law to submit and certify as being accurate, current and complete** in negotiating contracts and pricing and, thereafter, submitting otherwise fraudulent claims for payment under these prime contracts and subcontracts. LMC's and its subcontractors' fraudulent profits profits were enabled and covered up by LMC's fraudulent proposals and collusive submissions to the Government of **its subcontractors' fraudulent cost and pricing data.**

3.      LMC's knowing and deliberate violations of the applicable FAR and TINA provisions **rendered false** its express certifications/representations to the Government that all cost and pricing data provided for its proposals **and its attendant subcontractor proposals** were accurate, complete and current, because **they were not.** In addition to presenting, thus making or using, false statements or records containing false cost or pricing information to the United States, , LMC failed to disclose accurate, complete and current cost or pricing information. By knowingly submitting inflated cost proposals to the U.S.A. in its contractual and pricing proposals, LMC

---

**fraudulently induced** the U.S.A. to enter into the relevant contracts incorporating the attendant subcontracts, rendering each and every claim for payment submitted to the U.S.A. by LMC under those contracts a false or fraudulent claim for payment in violation of 31 U.S.C. § 3729(a)(1)(A). LMC submitted false claims for payment with actual knowledge, reckless disregard, or deliberate ignorance of their falsity. Moreover, by making, using, or causing to be made or used, false records and statements material to the payment of a false or fraudulent claim, LMC violated 31 U.S.C. § 3729(a)(1)(B). Additionally, LMC conspired with its subcontractors to pass through to the U.S.A., thereby adopting, their subcontractors' known false records or statements to **fraudulently induce** the U.S.A. to agree to the fraudulent contracts and subcontracts, including their fraudulent pricing, and to submit false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(C). LMC presented its claims and made, used or caused to be made or used these materially false certifications, statements and records with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the information. 31 U.S.C. §3729 (b)(1).

**II.**
**PARTIES**

4.    Plaintiff/Relator Ferguson is a citizen of the United States. Ferguson was a long-time employee of LMC and, at the relevant times alleged herein, variously held the jobs of Director and Audit Manager of LMC's Internal Audit/Subcontract Audit group ("IA/SCA" or "IA" or "SCA"). It was in this role, while undertaking and supervising audits of LMC subcontractors, that Ferguson uncovered LMC's corporate wide, massive fraudulent course of conduct described herein.

5.    In compliance with the False Claims Act, the United States will be served with this lawsuit through the United States Attorney General and the United States Attorney for the Eastern

District of Texas and have the opportunity to investigate while the action is under seal and decide whether to intervene.

6.      Defendant LMC is the world's largest defense contractor and is the prime contractor for the Joint Strike Fighter, the largest defense program ever, currently estimated to cost the U.S. taxpayers over $1.5 Trillion during its lifespan. LMC is a Maryland corporation and is headquartered in Bethesda, Maryland. It conducts business throughout the world as well as the United States, including the Eastern District of Texas.

### III.
### JURISDICTION AND VENUE

7.      This matter is within the Court's federal question jurisdiction, as Relator brings this action under the federal FCA, 31 U.S.C. § 3730(b)(1). Venue is proper in the Eastern District of Texas as LMC transacts business there. 31 U.S.C. § 3732(a). The Relator's action seeks remedies on behalf of the United States of America for Defendant's multiple violations of 31 U.S.C. § 3729 *et seq.*

### IV.
### FACTUAL ALLEGATIONS

8.      Ferguson has personal knowledge of all the following facts, which she learned in the course and scope of her employment at LMC. She is an Original Source of the information upon which her allegations are based, and she has not based her allegations or upon public disclosures by any other person or entity. See 31 U.S.C. § 3730(e)(4)(A)-(B).

**A.**      **Relator Ferguson and the IA/SCA Group.**

9.      Ferguson was employed by LMC from 2005 until June 2018. From 2007 through September 2011, Ferguson held the position of Director of Internal Audit. From 2011 to 2016 Ferguson held the title of Senior Manager, Subcontract Audit; from October 2016 through June

2018, Ferguson held the position of Manager of Internal Audit/Subcontract Audit. Until 2016, Ferguson reported to LMC's legal department within LMC's aeronautics company division, but thereafter Ferguson reported to LMC's Supply Chain unit in the same division. The subcontract files reviewed and audited by Ferguson involved executed subcontracts that were and are ongoing or completed.

10.    A primary responsibility of Ferguson's IA/SCA group throughout the events described herein was to conduct procurement **sub**contract audits **and cost/price analyses** on LMC's subcontractor suppliers. The ostensible purpose of the IA/SCA audits was to give LMC a means of ensuring that its subcontractor suppliers were in compliance with the U.S.A.'s procurement contract laws and regulations and to foster the appearance of the group's internal independence in order to provide the U.S.A. with transactional confidence with respect to contract proposals and claims for payments by the prime contractor and sub-contractors. **As part of its responsibilities as a prime contractor, LMC was required to perform these audits and cost/price analyses of its subcontractors; the U.S.A. relied on LMC's subcontractor audits and analyses as well as the cost and pricing data LMC and its subcontractors were required to submit to the U.S.A. This information was material to the Government's decision to enter the contracts described herein, as well as the Government's decision to pay LMC.**

11.    Three of the most **fundamental** requirements under **sole source** non-commercial Government procurement contracts **and their attendant sole source non-commercial subcontracts are compliance with (a) the FAR "cost principles" (FAR Part 31); (b) the Cost Accounting Standards; and (c) the submission of** "cost or pricing data" **as required by FAR §§ 15.403-4 and 15.403-5 and certification of the data in accordance with § 15.406-2 (pursuant to TINA. It is important to note that FAR Part 2 defines "certified cost and pricing**

data" as all facts that, as of the date of price agreement, or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price which prudent buyers and sellers would reasonably expect to significantly affect price negotiations. Cost or pricing data are factual, not judgmental; and are verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred. Within this context, and if the negotiated contract's value is (or is expected to be) above the TINA threshold (variously, as relevant here, $700,000 and $750,000) and LMC proposes that a subcontractor will do work in excess of the TINA threshold under that subcontract, both LMC and the non-commercial subcontractor are required to submit and certify all cost or pricing data. That data must be certified, and given to the Contracting Officer or his/her designated representative on the day, month, and year when price negotiations were concluded and price agreement was reached or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price. The prime contractor's cost/price analyses of any subcontract proposal, including the subcontract cost and pricing data, coupled with contractor and subcontractor TINA certifications, allow the Government's contracting officer to evaluate the reasonableness of the offered prices to ensure . the U.S.A. does not agree to over-pay under the proposed contract. The purpose of the TINA requirements is to ensure that both buyer and seller are on a level playing field regarding all known facts that prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Pursuant to TINA, if it is

---

QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT                                                                 – Page 6

found after contract award that the prime contractor or any of its subcontractors at any tier submitted data that were not accurate, complete and current as certified, the contract price, if affected, is to be reduced accordingly. Thus, an important part of Ferguson's job was to leverage the skills of the IA/SCA audit group to conduct what were supposed to be truly independent audits of LMC's subcontractors to ensure compliance with TINA/FAR's requirements, and to alert LMC to discharge its legal duty to self-remediate or to timely alert the U.S.A. contracting officer as to any non-compliance, accordingly.

**B.      Global False Claims Act Violations**

12.      LMC contracts with the U.S.A. to produce a variety of complex aircraft. Those contracts represent billions of dollars in annual revenues for LMC. **LMC does not "manufacture" the aircraft it supplies. Instead, it is primarily an assembler and integrator of the various parts, subsystems and software that comprise any aircraft that it supplies to the U.S. Government. For example, less than 12% of the proposed price of an F-35 Joint Strike Fighter is associated with LMC's direct manufacturing and engineering labor inputs. Thus, in accordance with TINA and the FAR, it is essential that LMC perform adequate cost and price analyses of its subcontractors and that LMC and its subcontractors (at any tier) provide and certify that accurate, complete, and current cost and pricing data have been submitted. The FAR** regulations exist to mitigate the risk of the government paying an inflated price for goods and services.

13.      **As part of its obligations as a prime contractor and in accordance with its own policies and procedures, LMC is required to evaluate supplier costs in accordance with the FAR, and is required, again by law and its own policies and procedures, to ensure that it and its suppliers are submitting and certifying cost and pricing data that meet the definition of**

---

**FAR Part 2 and that the data are accurate, complete. and current. The U.S.A. also relies upon LMC to evaluate its supplier costs in conformity with the FAR and to ensure its own and its subcontractors' compliance with TINA and FAR requirements,** which trust is enforced not only contractually, but by law under TINA. At the conclusion of **the agreement on subcontract price**, LMC, in accordance with 48 CFR § 15.406-3, must document the significant elements of the proposal analysis and negotiations, and **both LMC and its subcontractor must certify** that cost and pricing information provided to the Government were **accurate, complete and current per 48 CFR § 15.403-4.** LMC has systematically, knowingly and fraudulently violated the laws and regulations and abused its relationship of trust with the U.S.A. as an opportunity to pass on fraudulent and fictitious costs to the unwitting U.S.A.

14.     LMC intentionally and consistently performed inadequate **and fraudulent cost analyses** on its suppliers, largely because **LMC knowingly failed to require its subcontractors to submit all facts that, as of the date of price agreement, or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to significantly affect price negotiations—i.e., it did not require its subcontractors to submit all cost and pricing data. LMC knowingly followed this course of (in)action** in order to systematically defraud the U.S.A. of billions of dollars every year. This circumstance was unequivocally communicated multiple times to LMC, including in 2017; however, no changes were made. To date, there is no indication that changes have been made in LMC's historical practices.

15.     **Figures 1-A--1-C** below contains excerpts from a series of quarterly presentations provided to Tom Bradley (LMC Chief Financial Officer), Leo Weggemer (LMC Legal Executive Vice President), and Tom Simmons (LMC Executive Vice President Operations) by Ferguson in

---

the 2013-15 time period. The presentations were part of quarterly meetings Ferguson and her audit team had with LMC's executive management to discuss risks, status, and future areas of consideration. During the meetings, Ferguson had discussions with this executive leadership team about the fraud within the supply base that she was repeatedly uncovering through her group's audits. The charts below were used by Ferguson to communicate to the executive leadership team the trend she was seeing in subcontract defective data submittals. Within the presentations and supporting discussions, Ferguson made the following points to the executive leadership team:

(1) LMC Supply Chain was not concerned about the fraud her audit team was uncovering. They were more interested in closing the negotiations quickly, irrespective of the suppliers' ongoing efforts to defraud the government;

(2) Many of the suppliers had been allowed previously, under different LMC audit managers, to withhold cost and pricing data **related to subcontractor proposed rates,** and **those same LMC audit managers accepted the proposed rates without ensuring or requiring that subcontractors provide certified cost and pricing data that would have affected the agreed-upon price**. Ferguson made clear to her audit team that this practice would cease under her management;

(3) There was tremendous pressure being applied to Ferguson and her audit team by LMC Supply Chain to support **proposed costs that were fraudulently priced**. Supply Chain was unwilling to allow supplier **fraudulent** pricing to stand in the way of closing negotiations; and

**(4)** If **the subcontractor and LMC falsely certified cost and pricing data and LMC's attendant cost analyses were therefore false or fraudulent, it would be manifested in increased proposed costs passed on to the U.S.A. which would result in undeserved revenue and windfall profits to both the subcontractor and LMC.**

CONTINUED NEXT PAGE

---

**Figure 1-A**:



16.     Below is a chart from another presentation given to the executive management team in January 2014. The excerpt outlines the types of issues found at suppliers and reaffirmed to LMC Aero management that irregularities in the supplier data were prevalent and were the major contributor behind the 13% annual decrement percentage obtained by Ferguson's subcontract audit group.

**CONTINUED NEXT PAGE**

---

QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT                                           – Page 10

**Figure 1-B:**



> ## Decrement Drivers
>
> - **Unallowables Account for Small Percentage of Decrements**
> - **Inequitable Cost Distribution in Pools in Favor of Higher Proposed Rates**
> - **When Supplier Denies Access to Records, It Is Usually Found That There are Irregularities Related to the Support of the Proposed Rate**
> - **Examples of Irregularities (2013)**
>   - **Supplier 1 – No Support for Proposed Rate... When Pressed, Created Forecasts to Back into Desired Numbers**
>     - **Paying Expenses for Two Separate Unrelated Businesses on Their GL but Not Disclosing Additional Revenue Streams**
>   - **Supplier 2 – Depreciating Large Capital Expenditures over 4 Year Period Instead of 30 Years**
>   - **Supplier 3 – Padding Machine Rate Back Up to Include Expenses for Unrelated Machine**
>   - **Supplier 4 – Misclassified Direct Labor in Proposed Material Costs without Providing Visibility**
>   - **Supplier 5 – Included Expenses for Different Company in Overhead Pool to Inflate Rates**
>   - **Proposing Direct Labor for Effort That is Being Recovered in Their Overhead Pools**
>   - **Accounting Systems Which Do Not Separately Record Direct and Indirect Costs.**
>
> 16

**CONTINUED NEXT PAGE**

17.     **Figure 1-C** below is a presentation by Ferguson in January 2015 provided to the executive management team. The chart reflects that the Subcontract Audit ("SCA") group decremented suppliers by $95 Million in the year 2014. The message from Relator Ferguson, once

again to management, was that the decrements were the consequences of fraud and defective pricing. A secondary message from the presentation was that SCA was attempting to gain more suppliers that were amenable to her group auditing them. **SCA believed, based upon experience, that even one comprehensive audit would likely be** enough to find the fraudulent course of conduct and ensure transparency on future audits. SCA was attempting to reduce supplier costs in order to affect LMC's overall product affordability. However, this objective was derided by LMC. As it became apparent to the executive management team in January 2015 that Ferguson's efforts were responsible for more than $100 Million dollars **in reduced revenue and profit for its suppliers as well as itself, LMC management retaliated by seeking to discredit and stymie Relator and SCA's efforts to ensure honest and truthful contracting on behalf of the U.S.A.**

**CONTINUED NEXT PAGE**

Figure 1-C:



18.    It was the January 2015 presentation that prompted Tom Bradley to inform Ferguson, in February 2015, that she and her group's audit decrements were "costing [LMC] money," meaning that they were decreasing the value of the supplier subcontracts which affected **both LMC's and the suppliers' revenues and expected profit from each subcontract and contract. During that presentation, Ferguson highlighted that the SCA audits were resulting in more findings than audits done by DCAA auditors who would not have been aware that the subcontractors had failed to disclose relevant cost and pricing data.** The outcome of the LMC executive committee meeting was a request from Bradley that the Aero Audit Group investigate the difference between the SCA decrements and the DCAA decrements. When Bradley received the results in a draft report titled Internal Controls and Audit, Special Request-Risk/Harm Assessment of Subcontractor Rate Review, Recommendations on Supplier/Prime Contract Negotiations, dated June 17, 2015, no more discussions with him were had on the issue. The June

17, 2015 report reflected that SCA averaged 13% decrements compared to 1% for DCMA/DCAA in 2014 and that DCMA has declined to perform reviews on supplier proposals less than $10 million, creating a risk of Government exceptions.

19. In response to this work, LMC retaliated against the auditors. In the following year, 2016, the IA/SCA group was suddenly moved from working under the legal department to the Supply Chain Price Cost Analysis unit of LMC; 75% percent of the IA/SCA group (including Ferguson) were **demoted** and 25% were **laid-off**; audit time spans were reduced from 8 weeks to 2 weeks, and 2 inexperienced new auditors were assigned to audit the majority of complex high-dollar reviews. It became clear to Ferguson at this point that Bradley was seeking to force the group **to not pursue the required disclosure of cost and pricing data which would result in the performance of deliberately inadequate evaluations of suppliers' data, so as to create the appearance of uniformity with past supply chain cost analysts' practices.**

20. From 2013 through 2015, despite receiving repeated feedback from Ferguson in LMC SCA group audit reports and executive management team briefings that LMC's subcontract suppliers were consistently submitting defective data to support their proposal estimates and that Supply Chain practices were enabling, by purposefully ignoring, known defective data, LMC made no alterations to its evaluation practices or data/certification submissions to U.S.A. contracting officers. LMC made no modification, as inflated supplier costs resulted in higher **revenue (sales) and profits** for LMC at the expense of a defrauded U.S.A. In short, LMC systematically and on a large scale across its procurement subcontract proposals from at least 2008 onward, and likely before, knowingly failed to **ensure or require that its suppliers properly provided and certified their cost and pricing data and, as a result, LMC knowingly produced purposefully deficient** cost analyses on TINA-threshold **subcontracts** required by FAR § 15.403-4 (which flows down

---

to TINA-threshold sub-tier suppliers) and knowingly passed through to the U.S.A., indeed adopted, its suppliers' falsely certified data, to which it added its own false certifications, in violation of FAR § 15.403-4 and FAR § 15.408, to include Table 15-2 (subsection IIA(1)-(2) Cost Elements). Additionally, LMC systematically failed to disclose all material facts affecting price and costs in violation of TINA which required the contractor and subcontractors to submit all facts that a prudent seller or buyer would reasonably expect to affect price, 10 U.S.C. § 2306a. Further, by effectively and systematically concealing its suppliers' fraudulent and defective cost/price evaluations, LMC deprived the U.S. contracting officers of any realistic opportunity, as per FAR § 15.407-1, to detect false or fraudulent certified cost or pricing data, to secure price adjustments, and to recoup overpayments including interest and penalties.

21.     In short, the suppliers' data systematically were **not accurate, not complete and not current** although certified as such by LMC and its subcontractors to the U.S.A. LMC's systematically **false certifications concealed** its subcontractors'/suppliers' fraudulent, **defective evaluations** to **camouflage** the subcontractors' **inaccurate, incomplete and non-current** data so that its fraudulent course of conduct would not be detected

22.     Indeed, once LMC's executive management had knowledge, from Ferguson and her group's reports each year between 2013 and 2015, that their suppliers were **systematically** defrauding the U.S.A. and were being **systematically** enabled by **the LMC Supply Chain management organization, LMC had an obligation and opportunity to ensure that its employees complied with its existing Supply Chain policies and procedures, improve upon certain inadequate policies, procedures and training, and make the necessary management changes to ensure compliance with the law and to** self-report to the U.S.A. all known contract

---

QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT                                    – Page 15

overpayments it had received from the U.S.A., and thereby bring LMC and its suppliers into compliance with FAR. Instead, it doubled down on defrauding the U.S.A.

23.    From 2013 through the termination of her employment in 2018, in many of the hundreds of TINA-threshold procurement subcontracts Ferguson reviewed or audited in which she and her group evaluated a suppliers' direct labor hours after supply chain had completed its evaluation, Ferguson found that the suppliers' direct labor hours were not supported with complete and/or verified actual cost data and were deliberately inflated, resulting in fraudulent costs that would be or had been passed on to the U.S.A. During this time, Ferguson repeatedly informed Supply Chain, both in writing and verbally, of the fraud and the impact of LMC's FAR/TINA-imposed duties, but, with the acquiescence of LMC's executive management team, whom Ferguson also warned to no avail, Supply Chain did nothing to change what it was doing. Incredibly, Ferguson later found that none of the significant deficiencies identified by her group had **ever** been disclosed to the Government nor had LMC taken any additional actions to minimize the risk of fraudulently overcharging the Government subsequent to her reports.

24.    In fact, quite to the contrary, Mark Byars, a senior Supply Chain manager, confided in Ferguson in 2017, that Supply Chain would use suppliers' fraudulent direct labor hours to ensure price agreement was reached between itself and the supplier. Byars referred to the direct labor hours as "one of the levers" Supply Chain could pull in order to ensure their suppliers received a negotiation that both parties would benefit from. On various occasions, when an agreement could not be reached with a supplier, Supply Chain analysts would ask the supplier to revisit their proposed labor hours and submit an updated proposal. Once the supplier re-proposed, all that Supply Chain had to do was have itsr "independent Technical team" perform a purposefully ineffective evaluation based upon the resubmitted, inflated direct labor hours.

25.    LMC knowingly and systematically failed to ensure that LMC and its subcontractors **disclose all facts affecting price and cost negotiations in violation of TINA, which required LMC and its subcontractors to submit all facts that a prudent seller or buyer would reasonably expect to significantly affect price. 10 U.S.C. 2306a. Further, by effectively and systematically concealing its and its suppliers' false certifications, fraudulent, inadequate and defective price/cost evaluations were performed by LMC and LMC deprived the U.S. contracting officers any realistic opportunity, as per FAR § 15.407-1, to detect fraudulent certified cost or pricing data, to secure price adjustments, and to recoup overpayments including interest and penalties. By failing to ensure LMC was requiring the submission of and verifying the accuracy and completeness of** sub-tier contractors' **actual cost history/data on prior relevant subcontracts, it** falsely represented over and over again **that, in fact, the cost data had been provided and reviewed and, thus,** the cost analyses LMC had performed **could be relied upon by the Government.** LMC's purpose with these material omissions and false representations was to greatly **inflate both the subcontract and the prime contract prices** so that it and its co-conspirator sub-tier contractors could create and extract unlawful, inflated profits at the expense of the American taxpayer. As a result of this fraudulent scheme, the U.S.A. paid hundreds of m**illions of dollars** for costs that were **proposed based on fraudulent, false, and misleading cost and pricing certifications. LMC knew that the complete actual cost history had not been disclosed by its subcontractors and LMC intentionally or knowingly disregarded whether those same subcontractors had provided the required historical cost and pricing data and obtained and provided such data from the second-tier and lower subcontractors. This** exemplifies how LMC systematically and knowingly ignored, and in all reasonable likelihood, continues to **ignore, the requirements of the**

---

QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT                                          – Page 17

submission of actual and certified cost data, continues to fail to require its subcontractors do the same and continues to perform deliberately false and fraudulent cost analyses **including failing to verify that certified subcontractor cost and pricing data were accurate, complete and current so as** to artificially and fraudulently inflate its sales and profits at the expense of the U.S.A. and the American taxpayer.

26.   In approximately 100 LMC-U.S.A. procurement subcontracts valued in excess of $1 billion that were reviewed by Ferguson, LMC acted in concert with its sub-tier contractors to overcharge the U.S.A. by deliberately, intentionally, and/or recklessly **ignoring the requirements to submit subcontractor certified cost and pricing data, while at the same time deliberately performing fraudulent subcontract cost analyses, due at least in part to the absence or falsity of cost and pricing data.** Ferguson personally reviewed the procurement files and found none of the documentary indicia reflecting that accurate, complete and current **certified cost or pricing data had been submitted or that** accurate, complete and current cost analyses were performed as required by FAR § 15.406-2 and FAR § 15.408 Table 15-2. LMC intentionally, knowingly and systematically violated its duties under FAR § 15.408, of which the U.S.A. was not aware and which resulted in the U.S.A. being fraudulently induced to enter into contracts it would not have agreed to, had it known the truth about **LMC's and its subcontractors' repeated failures to submit mandatory cost and pricing data (including actual cost history) and their failures to** undertake the required, adequate and effective cost analyses **(including verification that the subcontractor had supplied accurate, complete and current cost and pricing data)** on its sub-tier **subcontractors** all of which resulted in false certifications to the U.S.A.

27.   **Out of more than 100 LMC procurement contract examples she reviewed, Ferguson found many instances in which LMC knowingly and fraudulently failed to: 1)**

---

**require the submission of accurate, complete, current certified cost and pricing data; 2) take any action to verify that such data were accurate, complete and current; and 3) utilize effective evaluation techniques including the provision of** the necessary actual cost data. Furthermore, in the more than 100 procurement contract files where Ferguson reviewed the supposed cost analyses on direct material, there were many and repeated **instances** in which LMC did not take any exceptions to the review of the material items to invoices—instead, the cost analyses stated that no exceptions were noted. This was a pattern: LMC made the same representations in most if not all procurement contract files in which Ferguson personally verified that no underlying documentation existed that would reflect that a truthful cost analyses had in fact been performed (*i.e.*, no testing was found, no results of testing, no itemization of items reviewed or specifics associated with invoices, competition results, *etc.*). In short, this systematic lack of tell-tale underlying supporting documentation corroborated what Ferguson suspected: LMC in fact seldom **required or verified that its subcontractors had provided the statutorily required cost and pricing data or perform** meaningful and honest cost analyses on either labor or material items as it represented to the U.S.A. that it had done and did nothing to ensure that the CCPD was verified so as to actually be **accurate, complete and current.**

28.     In accordance with 48 CFR 15.407-1(b), if *LMC* **1) failed** in its responsibility to **ensure that LMC and its subcontractors at any tier have submitted accurate, complete and current data containing all material facts relating to cost and price that, as of the date of price agreement, or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly; and 2)** provided cost analyses that at a minimum implied or gave rise to the reasonable inference that the aforementioned had been

---

done, the U.S.A. is entitled to relief for fraudulent inducement under the FCA. Additionally, 48 CFR 15.408 Table 15-2 (Section IIA(1)-(2)-- Cost Elements) requires LMC when submitting proposals to the U.S.A. which include materials costs, to conduct cost analysis for all subcontracts when certified cost and pricing data are submitted by the subcontractor. It further requires that the analysis of the certified cost and pricing data be submitted as a part of LM's own certified cost and pricing data.

29.    Here, with its sub-tier contractors, in contravention of its legal duties and responsibilities, LMC often:

- **Knowingly and intentionally failed to perform the required evaluation of sub-tiers' costs thereby rendering the associated cost analysis meaningless because LMC took no action to ensure that the certified cost and pricing data were accurate, complete and current as required by FAR;**

- **Failed to ensure that cost and pricing data were submitted that would enable the comparison of costs proposed by the offeror for individual cost elements with--**

  **(A) Actual costs previously incurred by the same offeror;**
  **(B) Previous cost estimates from the offeror or from other offerors for the same or similar items;**
  **(C) Independent cost estimates by technical personnel; or**
  **(D) Forecasts of planned expenditures.**
  **(E) Verification that the offeror's cost submissions are in accordance with the contract cost principles and procedures in Part 31 and, when applicable, the requirements and procedures in 48 CFR Chapter 99 (Appendix to the FAR loose-leaf edition), Cost Accounting Standards.**
  **(F) Review to determine whether any cost or pricing data, necessary to make the offeror's proposal suitable for negotiation, have not been either submitted or identified in writing by the offeror.**

- Where there were no Government Forward Pricing Agreements or recommendations available, knowingly and intentionally failed to perform the required cost analyses of sub-tiers' rates and factors, and, thus, enabled **sub-tiers to conceal** that they were fraudulently inflating their overhead rates, to the result of millions of dollars of overcharges being passed on to the U.S.A.; and

- Knowingly and intentionally **falsely certified** to the U.S.A. at each legally required, indeed material, procurement contracting step, that LMC had evaluated the labor cost and pricing data submitted by sub-tiers, and that at the point of price agreement between LMC and sub-

---

QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT                                    – Page 20

tier, the data were **accurate, complete and current**, when LMC knew **they were not**. These knowing and intentional false certifications resulted in the U.S.A. materially overpaying.

30. LMC's intentional material omissions, false certifications and failures to perform required analyses combined to fraudulently **induce the U.S.A.** into agreeing to multiple **fraudulently inflated procurement contracts and included subcontracts** that it otherwise would not have agreed to and also enabled sub-tier contractors to pass through **otherwise unsupported and fraudulently proposed** costs, resulting in the U.S.A. **overpaying** hundreds of millions of dollars or billions of dollars on contracts involving the JSF, C-130J, F-22 and F-16.

31. In the seven years of Ferguson's audit responsibilities at LMC, she **rarely if ever** encountered instances where her IA/SCA group found any documentary indicia that LMC had in fact verified a supplier's direct labor hours in accordance with 48 CFR 15.408 Table 15-2 as defined in 48 CFR 15.404-1. When Ferguson brought this to the attention of the Supply Chain organization (specifically Bob Mack and Mark Byars) she was informed that LMC cost analysts did **not** have the training to conduct such an analysis.

32. When Ferguson reviewed the Price Cost Analysis Memoranda ("PCAMs") and Price Negotiation Memoranda ("PNMs") in the procurement subcontract files she had access to, which was in excess of 100 and which were executed between 2008 and 2016, she personally confirmed from the PCAMs and PNMs seldom reflected any verification or assessment **that the certified cost and pricing data, including actual cost history, were accurate, complete and current.** This missing information validated that no bona fide cost analyses or other comparable evaluation of the sub-tier contractors' CCPD had been undertaken (despite the LMC's cost analysts' false representations and false certifications in those documents that such verifications

had been performed). These violations confirmed, objectively, **fraud in the inducement** of each of the subcontracts and their prime contracts.

33.     Ferguson further discovered from her review of these procurement contract files that where a cost analysis of direct labor hours was required, LMC or its sub-tier contractors often did not include complete actual cost history documentation that would reflect a compliant evaluation of proposed direct labor hours in comparison to the source of that data as required.

34.     With the foregoing knowledge in mind, in June 2017, Ferguson communicated to LMC that few if any of the countless cost analysis documents she had reviewed included accurate, complete and current cost and pricing data. **Figure 3** contains examples of such communications from Ferguson to LMC management.

**CONTINUED NEXT PAGE**

**Figure 3-A:**



**Figure 3-B:**



**Figure 3-C:**



**Figure– 3-D:**



**Figure 3-E:**



**Figure 3-F:**



35.     Ferguson was able to retrospectively tie together the significance of this pattern. For example, in numerous cases, the subcontractors' shoddy timekeeping practices resulted in the overstatement of direct labor hours data submitted to the U.S.A., which LMC knew about in real time, thereby artificially inflating the proposal price through the overstatement of direct labor hours required to perform work. The subcontractors then certified what they and LMC knew were false certifications that the submitted CCPD were accurate, complete and current. LMC then enabled a fraud to be perpetrated on the U.S.A. by misrepresenting that it had conducted cost analyses and by passing through the subcontractor's false certifications, adding to that its own false certifications, that the cost and pricing data and information submitted to the U.S.A. were accurate, complete and current. 48 CFR 15.403-4.

36.     LMC consistently, systematically, and knowingly concealed supplier inflated, unsupported, fraudulent costs, within their Bill of Material Dollars with the U.S.A. to fraudulently induce the U.S.A. into entering fraudulently priced contracts with the included subcontracts. This is not a random practice, but rather the systematic, global protocol by which LMC procures goods and services to sell to the U.S.A. In all cases, had LMC performed complete, meaningful and truthful cost analyses as required by the FAR, their sub-tier contractors' overstated and fraudulent costs would have been detected and the Contracting Officer would not have allowed those illegitimate, falsely represented costs to have been passed on to the U.S.A. or entered the contracts as proposed. By intentionally **not requiring the submission of accurate, complete and current cost and pricing data, including actual historical costs, not verifying that the data were accurate, complete and current and** not performing the FAR-required cost analyses, which failure had the blessing and imprimatur of LMC's executive management team, LMC passed through to and enabled fraudulent misrepresentations and false certifications by its sub-tier

---

contractors and itself, which **fraudulently induced** the U.S.A. into entering contracts valued in the billions of dollars and containing procurement subcontracts also valued at billions of dollars.

37.    LMC's foregoing actions violate the following laws:

- Knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval and knowingly making false certifications to the Government that cost and pricing data were accurate, complete and current for the purpose of **fraudulently inducing** the U.S.A. to enter into contracts at detrimental pricing levels to which the U.S.A. would not otherwise have agreed, 31 U.S.C. §3729 (a)(1)(A);

- Knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. §3729 (a)(1)(B);

- Knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government, 31 U.S.C. §3729 (a)(1)(G);

- Violation of prime contract clauses and TINA, 10 U.S.C. § 2306a, directly and via violations of FARs, including, but not limited to, FAR §§ 15.403-4, 15.406-2, 15.406-3, 15.407-1, 15.801, 31-205 as well as Defense Federal Acquisition Regulation Supplement, 48 C.F.R. §§ 201.101 *et seq.* ("DFARS") §§ 252.244-7001 and 48 CFR § 15-403-4 (10 U.S.C. § 2306a and 41 U.S.C. Chapter 35); 48 CFR § 15.408 Table 15-2 and 48 CFR §15.404-1, and

- Passing through and/or certifying to the U.S. contract pricing overcharges resulting from known false or inaccurate pricing information submitted by LMC, TLMAL and other suppliers.

38.    LMC conspired with subcontractors to pass inflated costs on to the U.S.A., creating a scheme by which both LMC and its subcontractors would unlawfully profit from knowingly, systematically, intentionally and fraudulently inflating sales prices which resulted in increased profits from the load factors applied (loads generally are material handling, G&A, profit%). Each of the subcontractors below are representative examples of how and with whom LMC has, at times

---

QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT                                          – Page 30

alone and at other times in conspiracy, **fraudulently induced** the U.S.A. to approve the contracts, subcontracts and pricing agreements detailed herein. As shown in greater detail below, the total value of a **few representative contracts** in this massive web of fraud is **staggering**:

- TLMAL:       **$ 139,544,592**

- Kirkhill:      **$ 222,445,473**

- KDA:         **$  93,530,228**

- KAI:          **$ 234,631,161**

- Elbit:         **$ 250,089,811**

- AIDC:        **$ 230,093,725**

**C.      The Specific Procurement Contract Fraudulent schemes.**

      **1.      TLMAL**

39.     The frauds here relate to the manufacturing of certain complex structure segments of the C-130J Hercules aircraft that LMC sells to the U.S.A. The frauds at issue fall into two categories: **(1)** LMC **fraudulently induced** the U.S.A. to enter large contracts by knowingly (within the meaning of the False Claims Act) and falsely certifying inaccurate, incomplete and non-current pricing/cost data (labor) during negotiations of those contracts with the U.S.A., and **(2)** with respect to the same contracts, LMC later knowingly submitted claims for payment by its subcontractor for fraudulently overcharged, fictitiously conceived labor hours. Had the U.S.A. known the falsity of such certifications and labor hour claims, those material facts would have had a natural tendency to influence, or have been capable of influencing, the approval of such contracts as well as the payments of the related claims submitted. The false statements and certifications were material. The financial damage caused to the U.S.A. on the contract as a result of LMC's **fraudulent inducement** is the value of the entire contract at **$139,455,592.**

**a.    LMC and Its Subcontractor Co-Conspirator: TLMAL**

40.    In 2010, LMC established a joint venture partnership with TATA, an Indian Company doing business and operating in Hyderabad India. The ownership rights between TATA and LMC were 74% and 26% respectively. The joint venture business name was TATA Lockheed Martin Aerostructures, Ltd. ("TLMAL"). The relationship between LMC and TLMAL was incestuous, with current LMC employees dominating the joint venture's executive management, including successive TLMAL Chief Operating Officers, David Tucker ("Tucker") and Robert Owenby ("Owenby"). In short, and by virtue of their dual roles within the companies, whatever Tucker and Owenby knew about TLMAL's operations, LMC knew.

**b.    The TLMAL Procurement Contract at Issue**

41.    On May 28, 2010, in order to **induce** the U.S.A. to agree to a contract with TLMAL as the **sole source subcontractor** for the production of Center Wing Boxes and Empennages for the C-130J aircraft, LMC requested that TLMAL submit to it a proposal for the production of Center Wing Boxes and Empennages associated with the C-130J Hercules aircraft that LMC, as the prime contractor, would sell to the U.S.A. The RFP number was DWC10-0205-001. The contract type was Firm Fixed Price with Performance Based Payments (FFP-PBP). The request was for 85 ship sets and the period of performance was from January 2012 through June 2016. The proposed contract exceeded the TINA threshold (valued at **$139,455,592**).

**c.    The "Who, What, When, Where and How" of LMC's Fraudulent Inducement in Concert with TLMAL**

42.    This fraudulent course of conduct involved several sequential steps or phases:

- LMC secretly **fed fictitious cost data** on labor hours to TLMAL with the agreement that TLMAL would then submit this fictitious labor hour data back to LMC to be then falsely and fraudulently **presented as being the data for a TINA/FAR-required cost analysis** that would

---

QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT                                – Page 32

ultimately be falsely certified to the U.S.A. contracting officer in a contract proposal;

- LMC then **allowed TLMAL to not perform the TINA/FAR-required cost analysis** on TLMAL's suppliers. Instead, **LMC conspired with TLMAL** to **use the fictitious labor hour data, despite knowing that the labor hour data from TLMAL were not only fictitious, but had been supplied to TLMAL by LMC**;

- LMC then knowingly included TLMAL's now **TINA-certified fictitious labor hour data** in LMC's certified **PCAM;**

- LMC **conspired with TLMAL to not** provide real, accurate, complete and current **cost and pricing data to include labor hour data. In addition, LMC performed a fictitious "cost analysis" of the TLMAL subcontract and did not alert the U.S.A.;**

- LMC then "negotiated" the subcontract with TLMAL valued at **$139,455,592,** knowingly including the **fictitious TLMAL labor hour data**, as to which **TLMAL falsely TINA certified that all factual data relevant to the negotiation of the proposed cost to LMC were "accurate, complete and current";**

- LMC then compiled the **PNM, including in it the cost analysis containing the fictitious LMC-supplied labor hours** and the **known false TINA certification of TLMAL** regarding those labor hours that LMC knowingly added to its **own false TINA certification** which concluded that LMC was not aware of any data that were **not** "accurate, complete and current." LMC then submitted this bundle of falsehoods to the U.S.A. contracting officer, via electronic, postal service or overnight mail service means; and

- the unwitting U.S.A. then, based upon false TINA certifications, was **fraudulently induced to accept the negotiated price of $139,455,592.**

### i. LMC Fed TLMAL Fictitious Labor Hour Data

43. Between 2013 and 2017, Ferguson conducted and supervised three (3) audits of TLMAL, including on-site visits at its facilities **in India**. Over the course of the these audits and in the aftermath, Ferguson was informed multiple times by people with knowledge that LMC's employee (Buyer), Wheaton Cave ("Cave"), provided to TLMAL **fictitious labor hour data** that TLMAL and LMC agreed they would use for this procurement contract and, which ultimately they both did use in the TINA/FAR-required **cost analysis and the** TINA-certified **PCAM** and **PNM**. The persons who made this statement and/or confirmed it to Ferguson included **(a)** TLMAL representatives Vishal Sanghavi (Business Manager and Supplier Pricer) ("Vishal") and Shouvick Banerjee (Supplier Pricer-to-be) ("Shouvick") on or about July 25, 2013 in person at Hyderabad India, and **(b)** LMC employee (Subcontract Manager) Steve Blakely on or about September 28, 2017, via conference call that involved Ferguson. LMC failed to obtain and analyze Current Cost and Pricing Data ("CCPD") as required by 48 CFR 15.404-3. Additionally, in 2017, Blakely shared with Ferguson an email reflecting that David Tucker, who had formerly been TLMAL's COO and concurrently an LMC employee, was aware of the loaning out of employees from TLMAL to other TATA companies.

### ii. LMC Fraudulently Claimed To Have Performed a Cost Analysis

44. Around or about February 2011, LMC Cost Analyst, Anthony Kim ("Kim") created a PCAM in support of the subcontract proposal, inwhich he stated that he had **performed a cost analysis of several of TLMAL's suppliers**, as delineated in the FAR at 48 CFR § 15.408 Table 15-2 given the TINA-threshold value of the proposals. Around July 25, 2013, Ferguson discovered that Kim's **statement was false** and that **he had not done any cost analyses** on any of TLMAL's identified suppliers.

---

45.     In February of 2012, TLMAL submitted to LMC its proposal for the 85 ship sets of the Empennage. The requested production rate was 36 per year. The Proposal dated February 23, 2012, was entitled "Empennage Structures of C-130J" and was **valued at $161,989,037**.

### iii.     LMC Completed TINA-Certified PCAM Using Known Fictitious TLMAL Labor Hour Data

46.     Around or about late-July 2013, Ferguson and another auditor on her IA/SCA team went to TLMAL's facilities in India to conduct the first audit. It was during this audit that TLMAL's representatives (described above) told Ferguson that LMC's Wheaton Cave had provided fictitious labor hour data to TLMAL for use in its proposal. TLMAL's COO and LMC employee David Tucker was physically present when TLMAL officials made these statements. The content of the statement was later confirmed to Ferguson by his successor COO Owenby.

47.     On or about July 25, 2013, Kim completed the TINA/FAR-delineated PCAM (PCAM-C130-11959 Revision 1 -TLMAL (C130J – Empennage Structures)), **including the fictitious labor hour data** provided to TLMAL by LMC's Cave. Kim made no disclosure that could have alerted the U.S.A. contracting officer that Kim had not undertaken the **falsely represented cost analysis**. No Current Cost Pricing Data was included because **TLMAL representatives refused** to provide it or make it available to Ferguson and her audit team. Ferguson asked Kim to request of TLMAL its **current** cost price data, as it then existed, since production was underway. However, Kim did nothing. LMC's actions **violated** 48 CFR 15.404-2, 48 CFR 15.406-3.

### iv.     LMC Knew that TLMAL Possessed Real, Accurate, Complete and Current Labor Hour Data, But Refused to Request It from TLMAL or to Modify the TINA/FAR-Required Cost Analysis Accordingly

48.     In August 2013, Ferguson returned to TLMAL's facilities in India to evaluate the impact of what was, by then, an extended period of performance on the contract. In the course of

---

the audit discussions, TLMAL representatives Vishal and Shouvick revealed that TLMAL had **substantially completed** the first of 85 Empennage units ("T-1") and had begun working on the second unit ("T-2"). Thus, Ferguson requested T-1 direct labor hour data from TLMAL to compare with the direct labor cost analysis provided by Kim in LMC's contract proposal. Vishal and Shouvick **refused** the request for updated direct labor hours for the (T-1) unit, telling Ferguson that they had already negotiated with Kim about the labor hours to be submitted.

49. Ferguson later discovered, in a third audit of TLMAL in 2017 (described in more detail in the overcharging fraud section below), that **TLMAL possessed current labor hour data** for the T-1 unit at the time of the August 2013 audit and that TLMAL knew as did its COO/LMC employee Tucker (and, thus LMC), that those hours already were **less than half of the fictitious labor hours supplied** to TLMAL by LMC and incorporated into LMC's contract proposal. LMC never accounted for this disparity, self-remediated, self-reported or in any way alerted the U.S.A. of the fraudulent information in any submission or TINA certification in support of the contract proposal. **Had the U.S.A. contracting officer** been made aware of this disparity and its **massive inflating impact** on the total value of the contract proposal, the U.S.A. would not have agreed to the proposed contractual terms. LMC's actions violated 48 CFR 15.404-2, 48 CFR 15.406-3.

> **v.    LMC "negotiated" the subcontract with TLMAL Knowingly Including Fictitious TLMAL Labor Hour Data, which TLMAL Falsely TINA Certified to LMC as "Accurate, Complete and Current."**

50. On September 5, 2013, the contract negotiations between TLMAL and LMC were completed. The final contract price was determined to be **$139,455,592**. Kim completed the PNM, PNM-C130-11959-TLMAL-Empennage Structures.

> **vi.   LMC Compiled and Submitted to the U.S.A. the Pretextual PNM and Included TLMAL's and its Own False TINA Certifications that the Information was "Accurate, Complete and Current"**

51.     As part of the contract negotiations with LMC, TLMAL was **required to certify** that the data were "accurate, complete, and current." **Specifically**, 48 CFR 15.406-2, 48 CFR 15.403-4(b)(2) and TINA (10 U.S.C. § 2306a(2), (3)) **require that accurate, complete and current cost and pricing data be certified at the completion of price negotiations**. Because the negotiated prices were higher than the TINA threshold, a Certificate of Current Cost/Price was executed by TLMAL on October 3, 2013. Thus, the **required certifications were made** by TLMAL and LMC, but the certifications were, unbeknownst to the U.S.A., **false**, as described above.

### vii.     LMC Fraudulently Induced the U.S.A. To Enter the Contract

52.     In 2014, LMC and the U.S.A. negotiated the final proposed contract terms. As part of that process, **LMC submitted** to the U.S.A. its own and TLMAL's **false TINA certifications** that all data presented were **accurate, complete, and current which was in fact, false.** LMC submitted these false TINA certifications to the U.S.A. electronically or by over-night or regular mail.

53.     As part of LMC's negotiation process with the U.S.A., the Government specifically requested that TLMAL provide actual production **direct** labor hours for the **first eight units**. TLMAL responded by reporting to the U.S.A. production labor hours within approximately 4,000 hours of the labor hours submitted to the U.S.A. by Kim. However, within these labor hours reported to the U.S.A., **TLMAL falsely inflated its production labor hours** by including unallowable **indirect** labor hours, which were fraudulently accumulated and co-mingled with allowable **direct** labor hours, as only by doing that would the actual reported labor hours even

---

begin to approach the fraudulently inflated labor hours submitted to the U.S.A. by Kim.[2] When

Ferguson reported this additional fraud to LMC's legal department, which was effectively the

commission of a further fraud to cover up the original fraud, she was reprimanded. Even though

LMC and TLMAL both knew that TLMAL had reported falsely inflated actual production labor

hours to the U.S.A., LMC never self-remediated or self-reported to the U.S.A.

54.     LMC knowingly engaged and conspired with TLMAL to execute a carefully

structured plan to betray the U.S.A.'s reasonable trust in TINA-mandated certifications of labor

hours to falsely inflate the actual value of those hours to fraudulently inflate the value of this

procurement subcontract. The U.S.A. was **induced** to accept the falsely certified data and

fraudulently induced to agree to the inflated contract terms and value, which it otherwise would

not have agreed to had it known the truth about the data or the falsity of the certifications.

### d.     The "Who, What, When, Where and How" of LMC's Overcharging Fraud in Concert with TLMAL

55.     During a third audit of TLMAL, in 2016, Ferguson and her auditors performed

additional testing on TLMAL's direct labor hours. It was during that testing, that the auditors

discovered that **TLMAL had included "on the job training"** in its direct labor hours.

Additionally, as described in the preceding inducement fraud section, above, it was during this

audit that Ferguson and her auditors discovered that TLMAL also included multiple categories of

indirect labor in its direct labor hours to justify the false and highly inflated labor hour numbers

that Kim originally submitted to the U.S.A. in the LMC contract proposal. Furthermore, it was

during this audit that Ferguson and her auditors discovered that TLMAL had instituted a "clocking-

in" system whereby TLMAL employees' clocked-in working time was assigned to and paid by

---

[2] LMC's subcontract with TLMAL did not have a "subject to downward adjustment" clause. Thus, if the U.S.A. declined to reimburse LMC for the full proposed contract value, LMC would be financially accountable, to TLMAL, for the shortfall between the paid amount and the subcontract value.

funds from the C130J Empennage procurement contract at issue here, but the **employees would physically leave the TLMAL facility** and go to work across the street at the private commercial TATA plants (*i.e.*, Sikorsky and TLMAL) with no accounting offset or reduction recognized for this in the direct labor hours cost reimbursement claims submitted to the U.S.A.

56.     The "**on the job training**" was a program that TLMAL used to train prospective Sikorsky and TLMAL (private, commercial enterprises), as well as TLMAL, employees. TLMAL created internal cost accounting documentation, which Ferguson saw during the third audit, that classified "training" as an overhead cost, demonstrating that TLMAL knew that training was not a direct labor expense. Despite this, TLMAL had improperly included these significant "on the job training" hours in the direct labor hours reported to the U.S.A. in support of the proposed contract value, which Ferguson saw.

57.     Concerning the "clocking-in" scheme, Ferguson personally observed it happening during the on-site portion of the audit in India. Additionally, TLMAL COO and LMC employee Robert Owenby admitted to Ferguson during the 2017 audit that in 2016 alone, TLMAL had loaned out at least forty (40) C130J Empennage contract-paid workers to Sikorsky and TATA. Owenby and others at **TLMAL (including Shouvick and Vishal) stated that this had been a consistent practice since the inception of the project**. Subsequently, Ferguson was informed, in September 2017, by LMC employee (Subcontract Program Manager) Steve Blakely ("Blakely") that the prior TLMAL COO/LMC employee, David Tucker, was aware of the practice as far back as 2013. The fraudulently inflated value of this fictitious labor on the four-year contract compounded damages to the Government, **in addition to** the foregoing inducement fraud.

58.     Ferguson repeatedly complained internally to the LMC Supply Chain management and legal department about the foregoing, compounding overcharging frauds and the fact that they

---

QUI TAM PLAINTIFF/RELATOR'S ORIGINAL COMPLAINT                                         – Page 39

violated FAR, to include Part 31.15, to no avail—LMC did not self-remediate nor did it self-report to the U.S.A. LMC enabled and effectively adopted TLMAL's overcharging fraud. Had the U.S.A. been aware of the foregoing materially false **overcharges**, it would have refused to pay these falsely inflated contract claims passed through by LMC. As such, LMC violated 31 U.S.C. §§ 3729 (a)(1) (A)-(C); 3729 (a)(1)(G).

### 2.    Esterline-Kirkhill

59.    The Esrterline-Kirkhill frauds relate to the provisioning of a variety of parts for the F-35 and F-22 aircraft that LMC sells to the U.S.A. The fraud at issue involved LMC **fraudulently inducing** the U.S.A. into large contracts for various F-22 and F-35 parts by **knowingly** (actual knowledge, deliberate ignorance of the truth or falsity of the information or reckless disregard of the truth or falsity of the information) and **falsely certifying** inaccurate, incomplete and non-current pricing/cost data (materials, labor) for one of its subcontractors, Esterline-Kirkhill ("Kirkhill") during negotiations of the contract with the U.S.A. Had the U.S.A. known the truth or falsity of such certifications and materials/labor hour claims, those facts would have had a natural tendency to influence, or have been capable of influencing, the execution of the contract and the subsequent payment of such claims. In other words, they were material facts. The financial damage caused to the U.S.A. on this contract as a result of LMC's **fraudulent inducement** of these four subcontracts is the value of the subcontracts at $230,663,755 (*i.e.*, $191,645,473 (F-35) + $30,800,00 (F-35) + $7,208,511 (F-35), and $1,009,771 (F-22)).

### a.    LMC's Subcontractor Co-Conspirator: Kirkhill

60.    Kirkhill is a subcontractor of LMC, located in Brea, California. As relevant here, Kirkhill primarily provided parts to LMC to be fitted on the F-35 and F-22 aircraft that LMC sells the U.S.A.

---

### b.    The Kirkhill Procurement Contract at Issue

61.    To induce the U.S.A. to agree to a subcontract, with Kirkhill as the sole source subcontractor, for the provisioning of various parts to the F-35 (for Low Rate Initial Production (**"LRIP") lots 4 through 9**) and F-22 aircraft, from March 2010 through June 2016, LMC requested various subcontract proposals from Kirkhill to provide various parts and sub-assemblies. The proposed subcontracts exceeded the TINA threshold.

### c.    The "Who, What, When, Where and How" of LMC's Fraudulent Course of Conduct in Concert with Kirkhill

62.    This fraud involved several related steps or phases:

• LMC knowingly failed to require Kirkhill to submit accurate, current and complete cost and pricing data; and 2) and intentionally failed to perform the required evaluation of Kirkhill's direct material, direct labor, and scrap costs, thereby rendering the associated supposed cost analysis a ruse which, in turn, invalidated the negotiated subcontract price between LMC and Kirkhill ;

• LMC knowingly and intentionally failed to require that Kirkhill perform a **Cost Analysis** on its sole source suppliers **over the TINA threshold**, as required in 48 CFR 15.408-Table 15-2, thereby passing through unsupported and, thus, unallowable and un-reimbursable costs to the U.S.A., thus causing the Government to pay a fraudulently inflated price that massively over-valued the prime contracts and subcontracts;

• LMC Knowingly and intentionally **failed to obtain from Kirkhill certified cost and pricing data including historical actual costs including but not limited to actual costs associated with Kirkhill's rates and factors and** thus, enabled **Kirkhill to conceal** the **fraudulent inflation of its overhead rates**, to the result of millions of dollars of **overcharges** being passed on to the U.S.A.;

---

- LMC knowingly and intentionally **falsely certified** to the U.S.A. at each legally required, material procurement contracting step, that LMC had properly and lawfully evaluated the direct material and labor cost and pricing data submitted by Kirkhill, and that at the point of price agreement between LMC and Kirkhill, the data were **accurate, complete and current** when LMC knew **it was not**; and

- the U.S.A. was fraudulently induced to execute F-35 and F-22 contracts that were grossly over-valued, which it would not have agreed had it known the truth.

### i.    The First Fraudulent Course of Conduct in Concert with Kirkhill

63.    In 2013, Ferguson and her IA/SCA group performed an audit of Kirkhill's contract proposal. During the audit, Ferguson and her group discovered that the costs within the proposal **could not be audited** because Kirkhill embedded **direct *material* dollars** with the value of its **internal direct *labor* hours** and falsely presented the total as direct material. The significance of this is that these amounts were included in the value of direct material, which was assessed by LMC's Supply Chain **cost analysis group,** who stated that they had reviewed 100% of the material proposed. To verify that the supplier has applied its rates correctly, a cost element breakdown is **required** by 48 CFR 15.408 Table 15-2. Kirkhill was **unable to produce an annual breakout** of the labor and material which is **required** by year for the parts, including seals and dots, for which they were proposing. Kirkhill's inability to provide this data **made it impossible to evaluate** the direct labor rates, direct labor hours, or direct material. However, Robert Hastings ("Hastings"), the LMC Cost Analyst, signed an evaluation of direct material, and he intentionally or recklessly, at least, stated that the supplier had provided all required data and that he had found no issues. In the July 2012 PCAM, Hastings TINA certified that he had reviewed **100%** of the bill of material invoices. However, Hastings couldn't have reviewed **100%** of the bill of material invoices because

**Kirkhill admitted** to Ferguson and her group that **it had not produced them for the proposal**. When Ferguson asked Hastings about this discrepancy, he admitted to her **that he had not reviewed the material** and had been **given guidance from one of his (unspecified) superiors at LMC on how to document the PCAM to avoid audit scrutiny and make it appear to be satisfactory.** In short, LMC's TINA certification was **knowingly and intentionally false**.

### ii.   The Subsequent, Follow-Up Fraudulent Course of Conduct in Concert with Kirkhill

64.    In 2017, Ferguson and her audit group performed another Kirkhill audit. In the course of the audit, Ferguson discovered that **Kirkhill used fraudulent accounting practices** in the development of its overhead rates that resulted in significant **overstatements** of the overhead expenses in the Government contracts. These fraudulent accounting practices uncovered by Ferguson's audit included **redirecting expenses and costs from commercial projects to the Government procurement contracts; inflating F-35 overhead pools** with company-wide shared overhead expenses, and **using un-allocable standard labor hours** that were 50% higher than the actual labor hours. These accounting practices violate 48 CFR 31.203, 48 CFR 31.201-2, and 48 CFR 15.403-1. **Ferguson's audits and review of the history of Kirkhill's proposals** on file at LMC, including contracts, PCAMs and PNMs, reflected that **Kirkhill had been engaging in these fraudulent practices** across multiple contracts executed with the U.S.A. in at least **2015, 2013 and 2010**, all with **LMC's knowledge and approval**.

65.    Ferguson brought these audit-revealed issues and resulting decrements to the attention of LMC cost analyst, James Dearman ("Dearman"), and his supervisor, Mark Byars ("Byars"), Supply Chain Senior Manager. Byars responded by informing Ferguson that although Kirkhill acknowledged that deficiencies existed, Kirkhill had anticipated a certain amount of profit from the contracts and could not afford to negotiate the contract down to the decrements resulting

---

from Ferguson's audit. In short, Kirkhill demanded that the contract proceed as proposed regardless of the FAR. And, LMC made it happen. On September 29, 2017, Supply Chain Management signed a Memorandum of Understanding ("MOU") with Kirkhill, which excluded the audit decrement, and was ultimately accepted by the U.S.A.. This **exclusion of the audit decrement** resulted in the U.S.A. **grossly overpaying on the contract, by subsidizing** Kirkhill's commercial profit centers and fraudulently hiding those costs in their indirect rates **as they had for more than seven years.** In the PCAM (PCAM-F35-15278) and PNM (PNM-F35-15278) **the LMC cost analyst knowingly and deliberately omitted to disclose that the fraud had been discovered at Kirkhill** and that **an audit report was available** at the time of negotiations. In the 2017 PNM, Ferguson's **SCA audit** report **was neither referenced nor attached**. In short, Kirkhill's fraudulent acts as described above were **known, concealed, enabled, passed through and, thus, adopted by LMC in the PNM**.

66.     Had the U.S.A. been aware of the preceding Kirkhill fraud, as known, enabled and adopted by LMC, it would not have executed any of the F-35, F-22 program contracts it entered into with Kirkhill **between 2010 and 2017** and it would have **refused to execute the relevant contract(s) and refused to pay the false and fraudulent contract claims** submitted to the U.S.A. by LMC. As such, LMC violated 31 U.S.C. §§ 3729 (a)(1)(A)-(C), 3729 (a)(1)(G).

**3.     Kongsberg Defense and Aerospace**

67.     The fraudulent course of conduct by Konsberg Defense and Aerospace ("KDA") relates to the manufacturing of certain segments, including the vertical tail, leading edges and rudder, of the F-35 aircraft that LMC sells to the U.S.A. The frauds at issue fall into two categories: **(1)** LMC induced the U.S.A. into a large contract by knowingly (actual knowledge, deliberate ignorance of the truth or falsity of the information or reckless disregard of the truth or falsity of

the information) and falsely certifying inaccurate, incomplete and non-current pricing/cost data **(missing historical actual costs including actual labor costs)** for one of its subcontractors during negotiations of said contract with the U.S.A., and **(2)** concerning the same contract, LMC later knowingly passed through to the U.S.A. claims knowingly submitted for payment by its subcontractor for overcharged materials and labor hours. Had the U.S.A. known the truth or falsity of such certifications of the material and labor hour claims, those facts would have had a natural tendency to influence, or have been capable of influencing, the **execution** of the subcontract and, subsequently, **the payment** of submitted claims; the conduct was material. The financial damage caused to the U.S.A. on this contract as a result of LMC's fraudulent negotiations and **inducement** of the subcontract is the value of the **entire subcontract at $125,645,565 as well as the value of the prime contract.**

### a. LMC and Its Subcontractor Co-Conspirator: KDA

68. Kongsberg Defense and Aerospace ("KDA") is a subcontractor of LMC, located in Norway (with offices and facilities in various locations in the United States). As relevant here, KDA manufactured aspects including the vertical tail, leading edges and rudder of the F-35 aircraft that LMC sells the U.S.A.

### b. The KDA Procurement Contract at Issue

69. To induce the U.S.A. to agree to a subcontract, with KDA as the sole source subcontractor, to produce segments of parts to the F-35 aircraft, from 2012 through 2016, LMC requested various proposals from KDA to produce segments including the vertical tail, leading edges and rudder of the aircraft. The proposed subcontracts all exceeded the TINA threshold. The prime contract at issue here was LRIP 10.

### c. The "Who, What, When, Where and How" of LMC's Fraudulent Course of Conduct in Concert with KDA

---

70.     The KDA fraudulent schemes involved several related steps or phases:

- LMC knowingly and intentionally **made false statements** in their PNM to conceal unsupported costs identified by the DCAA in their cost analysis;

- LMC knowingly and intentionally **performed a fraudulent cost analysis** on KDA's direct labor hours, and, thus, enabled **KDA to cover up** the fact it was fraudulently inflating its direct labor rates, to the result of millions of dollars of **overcharges** being passed on to the U.S.A.;

- LMC knowingly and intentionally **falsely certified** to the U.SA. at each legally required, indeed material, procurement contracting step, that LMC had adequately evaluated the direct material and labor cost and pricing data submitted by KDA, and that at the point of price agreement between LMC and KDA, the data were **accurate, complete and current**, when LMC knew **it was not**; and

- the U.S.A. was **induced** to enter a contract that was grossly over-valued, to which it would not have agreed had it known the truth. **Considering that the contract was fraudulently induced, the total harm to the U.S.A., was the value of the prime contracts, more than $10 billion.**

71.     In February 2017, LMC's aeronautics company division's Supply Chain group requested that Ferguson's SCA group perform an audit of KDA for F-35 LRIP proposals 9 and 10, submitted in October 2014. Cost Analyst George Becker ("Becker") and Mark Byars ("Byars"), Senior Manager in LMC Aeronautics Company ("Aero") division's Price Cost Analysis group informed Ferguson and James Garvey (auditor) that the DCAA had performed an audit of KDA's LRIP 9 and 10 proposals in 2015 as well as a follow up in early 2016. Becker informed SCA that the DCAA had decremented KDA by an amount that KDA would not agree to and that LMC

aerospace company division Supply Chain could not reach an agreement with KDA on the DCAA recommended rates. Byars and Becker disclosed to Ferguson that they had not updated their PNM and the F-35 System Program Office, with whom they negotiated LRIP 10, **was not made aware of the DCAA audit decrements.** Byars further told Ferguson that he did not want her to issue an official audit report on LRIPs 9 and 10 but wanted rates on which LMC could definitize the KDA LRIPs 9 and 10 agreement, effectively **asking her to cover up the fraudulent course of conduct**.

72. In fact, the PNM submitted by LMC to the U.S.A., dated February 16, 2015, had not been updated as of the date of LMC's negotiation of LRIP 10 with the U.S.A. in February 2017, **even though LMC already knew of the DCAA audit results and decrements.** Nor did LMC state or indicate in any way that the DCAA audit results and decrements had been received from the DCAA. **This deliberate omission rendered false the TINA certification in the PNM that all information in it was accurate, current and complete**. LMC was required by 48 CFR 15.406-3, disclose to the U.S.A. that more **accurate, complete and current** data existed (*i.e.*, DCAA-audited rates) as of the date of price agreement; LMC **knowingly and intentionally did not.** In short, as the U.S.A. agreed to and paid LMC the full value of the PNM-fraudulently evaluated and **unsupported** (*i.e.*, with non-DCAA audited) costs, the U.S.A. was **fraudulently induced** to agree to grossly-overvalued LRIP 10 when it otherwise would not have done so and subsequently reimbursed false claims for payment thereon passed through by LMC. **Considering that the subcontracts were fraudulently induced, the harm to the U.S.A., was the value of the subcontract and its attendant prime contract, in the billions of dollars.**

73. During her SCA group's 2017 audit, Ferguson further learned that LMC did **not perform a cost analysis on KDA's direct labor hours**. LMC **did not verify KDA's direct labor hours** with the accounting and timekeeping data from which those hours were derived. **KDA**

---

**falsely TINA certified its direct labor hours** to LMC and the U.S.A. in the LRIPs 9 and 10 PNMs by **failing to state therein that more accurate, complete, and current data existed as of the date of the price agreement**. In short, as the U.S.A. agreed to and paid LMC the full value of the PNM-fraudulently evaluated and unsupported (*i.e.*, with non-DCAA audited) costs, the U.S.A. was induced into approving the grossly-overvalued LRIP 10 when it otherwise would not have done so, and subsequently it reimbursed false claims for payment thereon passed through by LMC.

74. **Considering that the Government was fraudulently induced to enter the subcontract, the harm to the U.S.A. was the value of the subcontract together with the value of the associated prime contract which was billions of dollars.**

    4. **Korean Aerospace Industries**

75. The Korean Airspace Industries ("KAI") fraudulent course of conduct relates to the sub-assemblies, parts, and services for the F-35, C130J (aft-nacelle) and F-16 (fuselage) aircraft that LMC sells to the U.S.A. The fraudulent schemes at issue fall into two categories: **(1)** LMC **fraudulently induced** the U.S.A. into large contracts by knowingly (actual knowledge, deliberate ignorance of the truth or falsity of the information or reckless disregard of the truth or falsity of the information) and **falsely certifying inaccurate, incomplete and non-current pricing/cost data** (labor) for one of its subcontractors **during negotiations of said contract** with the U.S.A., and **(2)** concerning the same contract, LMC subsequently knowingly submitted un-reimbursable claims to the U.S.A. for overcharged materials and labor hours. Had the U.S.A. known the falsity of such certifications of the material and labor hour claims, those facts would have had a natural tendency to influence, or have been capable of influencing, the payment of such claims. The conduct was material. The financial damage caused to the U.S.A. on this contract as a result of LMC's **fraudulent inducement of the contract and subcontracts** is the value of prime contract,

in excess of $1 billion, including the value of the three subcontracts at **$234,630,361** (*i.e.*, $185,060,310 + $28,355,873 + $21,214,978).

### a.     LMC and Its Subcontractor Co-Conspirator: KAI

76.     Korean Aerospace Industries ("KAI") is a subcontractor of LMC, located in South Korea. As relevant here, KAI supplied various sub-assemblies, parts, and service for the C130J and F-16 aircraft that LMC sells the U.S.A.

### b.     The KAI Procurement Contract at Issue

77.     LMC fraudulently induced the U.S.A. to agree to a series of contracts for which KAI was the sole source subcontractor, for the production of segments of parts to the F-35 aircraft, from 2011 through June 2019; F-16 International Technical Assistance, KAI Proposal No. KAI-2010-F16_110308; and C-130J Engine Aft Nacelle Assembly. The proposed subcontracts exceeded the TINA threshold (valued at **$185,060,310 (F-16), $28,355,873 (F-16) and $21,214,978 (C-130)**).

### c.     The "Who, What, When, Where and How" of LMC's Fraudulent Course of Conduct in Concert with KAI

78.     The acts comprising this fraud involved several related steps or phases:

● LMC knowingly and intentionally **did not obligate KAI**, its sole source supplier, **to submit current cost and pricing data, in support of direct labor rates, direct material, outsourced labor, or overhead rates,** thereby making the mandated TINA/FAR-**required cost analysis impossible**;

● LMC knowingly and intentionally allowed KAI to **not** perform the cost analysis on its sole source TINA-threshold suppliers' costs and, thus, enabled **KAI to cover up** the fact it was **fraudulently inflating its direct labor rates, to the result of millions of dollars of**

**overcharges being** submitted to the U.S.A., and it failed to withhold overcharged contract monies from KAI;

- LMC knowingly and intentionally **falsely certified** to the U.S.A. at each legally required, indeed material, procurement contracting step, that LMC had properly evaluated the direct material, overhead and labor cost and pricing data submitted by KAI, and that at the point of price agreement between LMC and KAI, the data were **accurate, complete and current**, when **LMC knew it was not**; and

- the U.S.A. was induced into agreeing to contracts that were completely unsupported and not reimbursable in the entire value of the subcontracts, which it otherwise would not have agreed to had it known the truth.

79.    Ferguson and her SCA group performed several audits of KAI between 2012 and 2017. In the course of those audits audit, Ferguson learned that LMC cost analyst, Anthony Kim (see TLMAL above), was responsible for the KAI cost analysis on the direct labor hours, direct material, and profit. Per CFR 48 CFR 15.403-4, as each of the three contract proposals contained TINA-threshold subcontracted costs to KAI's suppliers, **Kim was required to assess and document the adequacy** of KAI's cost analysis on its **suppliers' subcontracted costs**, as per 48 CFR 15.404-3, 48 CFR 15.406-3. During these audits, Ferguson discovered, concerning the three subcontract proposals at issue here, that Kim, in fact, intentionally and knowingly **neither performed nor insisted**:

- that KAI **perform a cost analysis** on the outsourced labor from KAI to its co-owned suppliers;

- that KAI **perform a cost analysis** on the direct material for the material subcontracted by KAI over the TINA threshold; or

---

- that KAI provide cost and pricing data in support of the direct labor and overhead rates in KAI's proposal, all of which confirmed that **Kim could not and did not perform a cost analysis on KAI**. Furthermore, **Kim failed to disclose** in the October 30, 2013 PNM he submitted to the U.S.A. contracting officer that KAI had imposed significant audit scope restrictions that **prevented LMC auditors from tracing the rates and factors** back to KAI's accounting records, rendering the numbers Kim TINA certified in the PNM **unsupported and undeterminable**. Without the determination of price **reasonableness, allowability, and allocability**, the costs were not supportable in accordance with the FAR. LMC's TINA-certified PNM statement that it was unaware of any information therein being **inaccurate, incomplete, and non-current** or to alert therein the U.S.A. contracting officer of the aforementioned condition of KAI's cost data and analysis processes **was an intentional and knowing concealment of adverse financial information**.

80. LMC's intentional and knowing submission of non-reimbursable costs in **support of the three proposed procurement contracts**, coupled with a **knowingly false TINA certification in the October 30, 2013 PNM, fraudulently induced** the U.S.A. to agree to a contract and subsequently reimburse submitted false claims thereunder. **Considering that the Government was fraudulently induced to enter the contract, the harm to the U.S.A., was the value of the subcontract, $234,630,361, as well as the value of the associated prime contract.**

### 5. Elbit Systems

81. Elbit's fraudulent course of conduct relates to the sub-assemblies, parts, and services for the F-35 (helmet-mounted display), aircraft that LMC sells to the U.S.A. LMC **fraudulently induced** the U.S.A. into a large contract by knowingly (actual knowledge, deliberate ignorance of the truth or falsity of the information or reckless disregard of the truth or falsity of

the information) and **falsely misrepresenting that an audit would be performed** to allow for a cost analysis that would support the proposed contract costs. Had the U.S.A. known the truth or falsity of such misrepresentation/certification, those material facts would have had a natural tendency to influence, or have been capable of influencing, the execution of the contract, and subsequently the payment of such claims. The false statements were material. The financial damage caused to the U.S.A. on this contract as a result of LMC's fraudulent **inducement** of the subcontract is the value of the subcontracts at **$250,089,811and the value of the associated prime contract**.

### a. LMC and Its Subcontractor Co-Conspirator: Elbit

82. Elbit Systems Haifa ("Elbit") is a subcontractor of LMC. As relevant here, Elbit was part of a contract to supply helmet mount display systems for the F-35 aircraft that LMC sells the U.S.A.

### b. The Elbit Procurement Contract at Issue

83. To induce the U.S.A. to agree to a series of contracts, with Elbit as the sole source subcontractor, in August 2014, Rockwell Collins-Elbit Systems of America-Vision Systems, submitted a proposal to LMC for **Helmet Mount Display Systems** supporting the F-35 program, LRIPs 8-11. The period of performance was July 2017 through January 2021. The proposed contract exceeded the TINA threshold (valued at $250,089,811).

### c. The "Who, What, When, Where and How" of LMC's Fraudulent Course of Conduct in Concert with Elbit

84. This fraudulent scheme involved several related steps or phases:

- LMC knowingly and intentionally did **not** obligate Elbit, a sole source supplier, to **submit current cost and pricing data**, in support of direct labor rates, direct material, outsourced labor, or overhead rates, thereby **making the TINA/FAR-required cost analysis impossible;**

---

- LMC knowingly and intentionally **allowed Elbit to not perform a cost analysis** on its sole source TINA-threshold suppliers' costs and, thus, enabled **Elbit to cover-up** the fact it was fraudulently inflating its direct labor rates, to the result of millions of dollars of **overcharges** being passed through to the U.S.A. and failed to withhold said contract monies from Elbit;

- LMC knowingly and intentionally **falsely certified** to the U.S.A. at each legally required, indeed material, procurement contracting step, that LMC had properly evaluated the direct material, overhead and labor cost and pricing data submitted by Elbit, and that at the point of price agreement between LMC and Elbit, the data were **accurate, complete and current**, when LMC knew **they were not**; and

- the U.S.A. was **fraudulently induced** to agree to a subcontract that was completely unsupported and not reimbursable in the entire value of the contract, at **$250,089,811**, which it otherwise would not have agreed to had it known the truth.

85. The LMC-prepared PCAM on the proposed subcontract, dated November 2014, stated that a rate and factor audit was requested of DCAA/DCMA Ferguson requested the audit results from the assigned LMC costs analysts, Ryan Murphy ("Murphy") and David Walker ("Walker"). Walker responded to Ferguson by email, on February 7, 2017, and stated that LMC had **never requested an audit by DCMA/DCAA. Walker further corroborated to Ferguson that the contract had in fact been negotiated without any audit being requested of the DCMA/DCAA.** In short, **no cost analysis** was performed on Elbit, a TINA-threshold subcontractor, and the U.S.A. was misled to believe that a DCMA/DCAA audit would be requested and performed, which would permit such a cost analyses to be done to support the proposed costs, thereby **fraudulently inducing** the U.S.A. to agree to a contract it otherwise would not have agreed to execute. LMC intentionally and knowingly made false statements in the PCAM and **did not**

**disclose that a cost analysis had not even been requested**, let alone performed, to support a cost analysis, when the contract was agreed to by the U.S.A.

### 6. Aerospace Industrial Development Corporation

86. The fraudulent course of conduct here relates to the retrofit kit installation and servicing on 143 F-16 aircraft that LMC sells to the U.S.A. The fraudulent schemes at issue fall into two categories: **(1)** LMC **fraudulently induced** the U.S.A. into a large contract by knowingly (actual knowledge, deliberate ignorance of the truth or falsity of the information or reckless disregard of the truth or falsity of the information) and **falsely certifying inaccurate, incomplete and non-current pricing/cost data** (labor) for one of its subcontractors **at the time of the agreement** with the U.S.A. on price, and **(2)** concerning the same contract, LMC later knowingly submitted the false claims to the U.S.A. for payment of its subcontractor's fraudulently inflated labor hours. Had the U.S.A. known the falsity of such certifications of the labor hour claims, those facts would have had a natural tendency to influence, or have been capable of influencing, the **execution** of the contract, and subsequently the payment of the submitted claims. The false statements were material. The financial damage caused to the U.S.A. on this contract as a result of LMC's fraudulent negotiations and inducement of the contract is the value of the subcontract at **$230,093,725 and the value of the associated prime contract.**

#### a. LMC and Its Subcontractor Co-Conspirator: AIDC

87. Aerospace Industrial Development Corporation ("AIDC") is a subcontractor of LMC, located in Taiwan. As relevant here, AIDC supplied various retrofitting and services for the F-16 aircraft that LMC sells the U.S.A.

### b. The AIDC Procurement Subcontract at Issue

88.     LMC fraudulently induced the U.S.A. to agree to a series of contracts, with AIDC as the sole source subcontractor, for the retrofitting and servicing of F-16 aircraft, from January 2014 through December 2021. The proposed subcontract exceeded the TINA threshold (valued at **$230,093.725).**

### c. The "Who, What, When, Where and How" of LMC's Fraudulent Course of Conduct in Concert with AIDC

89.     This fraudulent scheme involved several related steps or phases: **(1)** LMC knowingly and intentionally **did not obligate AIDC**, its sole source supplier, to **submit current cost and pricing data**, in support of direct labor rates, direct material, outsourced labor, or overhead rates, thereby making the TINA/FAR-required cost analysis impossible; **(2)** LMC knowingly and intentionally allowed AIDC **to not perform a cost analysis** on its sole source TINA-threshold suppliers' costs and, thus, enabled **AIDC to cover up** the fact it was **fraudulently inflating** its direct labor rates, to the result of millions of dollars of **overcharges** being passed through to the U.S.A., and failed to withhold those excess contract monies from AIDC; **(3)** LMC knowingly and intentionally **falsely certified** to the U.S.A. at each legally required—indeed material—procurement contracting step, that LMC had properly evaluated the direct material, overhead and labor cost and pricing data submitted by AIDC, and that at the point of price agreement between LMC and AIDC, the data were **accurate, complete and current**, when LMC knew **they were not**; and **(4)** the U.S.A. was **fraudulently induced** to agree to a subcontract that was completely unsupported and not reimbursable in the entire value of the sub contract, at **$230,093.725**, to which it other would not have agreed to had it known the truth as well as the associated prime contract.

90. In March 2013, AIDC submitted a proposal to LMC in the amount of **$369,908,340** supporting the **F-16 program**. The value of the proposal was over the TINA threshold, requiring a **cost analysis**. The PCAM (AIDC PCAM 12961) was completed on September 16, 2013. A purchase order was issued in 2014, in the amount of **$230,093,725**. The LMC cost analyst, Mary Riley ("Riley") stated in the PCAM that actual labor hour data were used to support the proposed contract. When Ferguson and her IA/SCA group audited AIDC's labor hour hours in 2015 & 2016, **Ferguson discovered that Riley's statement in the PCAM** that actual labor hour data were adequately evaluated and used **to support the proposed contract was false** as there was no accounting in the PCAM for the fact that AIDC employees **were logging on to task orders all day**, inclusive of their lunch breaks, and that AIDC was mischarging the F-16 program the values established in the fixed price contract by substituting the direct labor for low dollar technicians that they were paying far less than AIDC had proposed and was being reimbursed for by the U.S.A. This was also confirmed to Ferguson by LMC's AIDC program manager, Anthony Stone who was co-located on-site in Taiwan. Additionally, Riley described, repetitively, what were estimated direct labor hour amounts that LMC had pre-determined were supposedly reasonable labor hours for the proposal—not useable labor hour data that then existed and analyzable under cost accounting principles. In fact, during a follow-up audit, after a period of contract performance, in 2016, Ferguson attempted to confirm the hours consumed by AIDC**; however, they refused,** much the same as TLMAL, **to provide actual direct labor hours for the efforts to date**. Ferguson reported this to LMC Supply Chain management; however, LMC never self-remediated nor self-reported these inflated costs to the U.S.A. and continued to submit false claims to the U.S.A. for reimbursement.

91.     Because the overall contract was fraudulently induced based on these grossly inflated and unallowable AIDC labor costs, the harm to the U.S.A. was the value of the overall contract, at **$230,093.725 and the attendant prime contract.**

### 7.     Additional Subcontract Proposals Lacking Cost Analyses and Fraudulently Induced

92.     The preceding subcontracts are just a few specific examples of many fraudulent subcontract certified cost and pricing data included in many of LMC's contract proposals to the U.S.A. in which LMC induced the U.S.A. to agree to contracts by intentionally and knowingly misleading U.S.A. contracting officers into believing that:1) the **certified cost and pricing data submitted by LMC and its subcontractors were accurate, complete and current when they were not; 2) LMC was performing legitimate arms-length subcontract cost evaluations when it was not; 3) LMC was requiring its subcontractors to obtain certified cost and pricing data from lower-tier subcontractors when they were not, and 4) LMC took actions to verify that the certified cost and pricing data submitted by its subcontractors were accurate, complete and current when it did not.**

### D.     Laws Broken by LMC

93.     LMC's actions concerning the above contracts constitute fraudulent courses of conduct against the U.S.A. in violation of the False Claims Act by:

- knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval and making false cost and pricing certifications to the U.S.A. to fraudulently induce the U.S.A. to enter into contracts at detrimental pricing levels to which the U.S.A. would not otherwise have agreed, 31 U.S.C. §3729 (a)(1) (A);

- knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. §3729 (a)(1)(B);

- Conspiring to do any of the foregoing, regardless of whether paid or not, 31 U.S.C. § 3729(1)(C)(re (A), (B), (D), (F) or (G));

- Knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government, 31 U.S.C. §3729 (a)(1)(G);

- collusive agreement (*i.e.*, a conspiracy), 31 U.S.C. § 3729(a)(1)(C), between and amongst LMC employees/officers/vice principals/agents/representatives and subcontractors and their employees/officers/vice principals/agents/representatives to agree to conceive and implement a systematic scheme to defraud the U.S.A. by knowingly accepting, passing through and/or certifying to the U.S.A. contract pricing overcharges resulting from known false or inaccurate pricing information submitted by LMC and its suppliers; and

- violation of prime contract clauses and TINA, 10 U.S.C. § 2306a, directly and via violations of the FAR, including, but not limited to, FAR §§ 15.403-4, 15.406-2, 15.406-3, 15.407-1, 15.801, 31-205 as well as DFARS § 252.244-7001 and 48 CFR § 15-403-4 (10 U.S.C § 2306a and 41 U.S.C. Chapter 35).

## V.
## CAUSES OF ACTION

94.    Ferguson fully incorporates every fact set forth in every paragraph above concerning every cause of action set forth below.

**A.    Counts One through Three– Violations of False Claims Act**

95.    LMC is liable under the False Claims Act, which attaches to any person who (among other violative acts)

---

1.  knowingly presents or causes a false or fraudulent claim to be presented for payment (false claim), 31 U.S.C. § 3729(a)(1)(A);

2.  knowingly makes or uses a false record or statement material to a false or fraudulent claim for payment (false statement), 31 U.S.C. § 3729(a)(1)(B); or

3.  conspires with another to do either of these things(conspiracy), 31 U.S.C. § 3729(a)(1)(C).

96.    Under the False Claims Act, "knowing" and "knowingly" mean that a person, with respect to information:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b).

97.    The courts have held that the False Claims Act is violated by a person who engages in a fraudulent course of conduct where the person by makes a false statement or a false record in the course of, or regarding the fraudulent course of conduct (false statement), or expressly or impliedly certifies compliance with legal or regulatory requirements which are violated in the fraudulent course of conduct, which renders any claim for payment arising from the scheme a false claim (false claim).

98.    By virtue of the acts described above, Defendant LMC knowingly caused and conspired and/or continues to cause and conspire to be submitted, false or fraudulent claims to the U.S.A. for payment under multiple large defense contracts, to include **fraudulently inducing**, by

false express and/or implied certifications, the U.S.A. to agree to grossly over-valued procurement contracts and then compounding that fraud by submitting false or fraudulent overcharges.

99.     The United States Government paid and continues to pay such false claims.

100.    Because of Defendant LMC's acts, the United States Government has been damaged, and continues to be damaged in substantial amounts to be determined at trial, but not less than many hundreds of millions of dollars. The pervasive fraudulent inducement plus large contract sums rendered all the submitted claims for payment to be false claims and thus constitute the single damages sum to be multiplied by the District Court.

## VI.

## JURY DEMAND

101.    Ferguson hereby exercises the right to trial by jury on claims, issues, and defenses in this action.

## VII.
## PRAYER AND REQUEST FOR RELIEF

102.    On behalf of the United States, Relator seeks to recover all relief available under the FCA, as amended. Relator seeks for the U.S.A. monetary damages equal to three (3) times the damages suffered by the United States. In addition, Relator seeks to recover all civil penalties and other relief on behalf of the United States Government and the Relator in accordance with the FCA.

103.    Relator should, for her contribution to the Government's investigation and recovery, be awarded a fair and reasonable Relator's share pursuant to 31 U.S.C. § 3730(d) of the FCA.

104.    Relator seeks to be awarded all costs and expenses for this action, including statutory attorneys' fees, expenses, court costs, and any available pre-judgment or post-judgment interest at the highest rate allowed by law.

WHEREFORE, premises considered, Relator prays that this District Court enter judgment on behalf of the United States and against the Defendant for the following:

a.       damages in the amount of three (3) times the actual damages suffered by the United States and all statutory penalties arising from the Defendant's unlawful conduct which violated the FCA;

b.       a Relator's Share from the recoveries in a statutory amount which is fair and reasonable under the circumstances;

c.       Relator's statutory attorneys' fees, expenses, and costs of court;

d.       pre-judgment and post-judgment interest, at the highest rate allowed by law; and

e.       all other relief to which Relator and/or the United States may be justly entitled, whether at law or in equity and which the District Court deems just and proper.

DATED: February 7, 2020

---

Respectfully submitted,


By:   **/s Samuel L. Boyd**
      Samuel L. Boyd
      *Texas Bar No. 02777500*
      Catherine C. Jobe
      *Texas Bar No. 10668280*
      **Boyd & Associates, PC**
      6440 North Central Expressway
      Suite 600
      Dallas, Texas 75206
      Phone: 214-696-2300
      Fax:    214-363-6856
      sboyd@boydfirm.com
      cjobe@boydfirm.com

Counsel for Qui Tam Plaintiff/Relator

By:   /s/ Roger D. Sanders
      Roger D. Sanders
      TX SBN 17604700
      J. Michael Young
      TX SBN 00786465
      **Sanders, Motley, Young & Gallardo, PLLC**
      III South Travis
      Sherman, TX 75090
      (903) 892-9133 (Tel.)
      (903 892-4300 (Fax)

Local Counsel for Qui Tam Plaintiff/Relator

---

## CERTIFICATE OF SERVICE ON THE UNITED STATES OF AMERICA

On February 6, 2020, prior to filing in this Court, Relator disclosed to the United States substantially all information in her possession, custody or control, and a copy of her proposed Original Complaint to James Gillingham, Assistant U.S. Attorney, at the Office of the U.S. Attorney for the Eastern of Texas, via e-mail.

On February 7, 2020, a copy of Relator Ferguson's Original Complaint, filed under seal, was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon: Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001.

On February 7, 2020, a copy of this Original Complaint was served by email upon the U.S. Attorney's office, Mr. James Gillingham, for the Eastern District of Texas.


s/ Samuel L. Boyd
Samuel L. Boyd