**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | |
| *ex rel*. MARIA DEL CARMEN GAMBOA | : | |
| FERGUSON, *ET AL*. | : | Civil Action No.: 4:24-cv-00025-O |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| LOCKHEED MARTIN CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**APPENDIX IN SUPPORT OF DEFENDANT LOCKHEED MARTIN CORPORATION'S
SUR-SUR-REPLY IN SUPPORT OF ITS RENEWED MOTION TO DISMISS**

| Exhibit | Description | Appendix Pages |
|---|---|---|
| Exhibit A | Vernon J. Edwards & Ralph C. Nash, *The FAR: Does It Have Contractual Force And Effect?*, 31 Nash & Cibinic Rep. NL ¶ 10 (Feb. 2017). | 001-008 |

Respectfully Submitted,

/s/ *Michael J. Bronson*
Michael J. Bronson
Ohio Bar No. 0074448
Joseph W. Harper
Ohio Bar No. 0079902
Patrick M. Hagan, *pro hac vice*
Ohio Bar No. 0079927
Chelsea J. Chalk, *pro hac vice*
Ohio Bar No. 0098056
Dinsmore & Shohl LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202

Tel: (513) 977-8200
Fax: (513) 977-8141
Email:  michael.bronson@dinsmore.com
        joe.harper@dinsmore.com
        patrick.hagan@dinsmore.com
        chelsea.chalk@dinsmore.com

*Trial Counsel for Defendant*
*Lockheed Martin Corporation*

Anthony J. Campiti
Texas Bar No. 00798092
HOLLAND & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel: (214) 969-1700
Fax: (214) 969-1751
Email: tony.campiti@hklaw.com

*Counsel for Defendant*
*Lockheed Martin Corporation*

*This material from The Nash & Cibinic Report has been reproduced with the permission of the publisher, Thomson Reuters. Further use without the permission of the publisher is prohibited. For additional information or to subscribe, call 1-800-344-5009 or visit Thompson Reuters Legal Solutions. The Nash & Cibinic Report is now available on Westlaw. Visit westlaw.com.*

## 31 Nash & Cibinic Rep. NL ¶ 10

Nash & Cibinic Report
February 2017
The Nash & Cibinic Report
*Disputes & Litigation*

Vernon J. Edwards & Ralph C. Nash

## ¶ 10. THE FAR: Does It Have Contractual Force And Effect?

Everyone knows that the Federal Acquisition Regulation applies to Government acquisitions. But what does that mean, exactly? Applies to what? To whom? How? It appears that there is some confusion, as can be seen in a recent decision by the Armed Services Board of Contract Appeals, *Lockheed Martin Integrated Systems, Inc.*, ASBCA 59508, 2016 WL 7655944 (Dec. 16, 2016). The case involved disputes under two support services contracts.

In 2003, the Army awarded an indefinite-delivery, indefinite-quantity, time-and-materials contract to Lockheed (LMIS) for various support services for one year with three two-year options. The board referred to that as the "CR2 contract." That contract included the clause at FAR 52.232-7, "Payments Under Time-And-Materials and Labor-Hour Contracts (DEC 2002)." In 2006, the Army awarded LMIS another such contract, this one for five years with one five-year option, which the board referred to as the "S3 contract." That contract included a later edition of FAR 52.232-7, dated "DEC 2005." (The differences in the two clauses were not relevant.)

LMIS awarded T&M subcontracts under both contracts. The subcontractors billed LMIS for labor and materials, LMIS billed the Army for reimbursement, and the Army paid. In January 2014, the Defense Contract Audit Agency began an audit of LMIS's completion invoices/vouchers under both the CR2 and the S3 contracts and began some assist audits of some subcontractor charges. In a May 2014 audit report, the DCAA accused LMIS of failing to manage its subcontractors and challenged the allowability of $102,294,891 in reimbursed subcontract costs under the CR2 contract and $25,340,381 under the S3 contract. (For information about the DCAA's procedures regarding "questioned" and "unresolved costs" see the DCAA's CONTRACT AUDIT MANUAL, Chapter 6, "Incurred Costs Audit Procedures.")

The DCAA based its challenges on FAR 31.201-2, "Determining allowability," subparagraph

APP_001

(a)(4), which conditions the allowability of costs on compliance with the terms of the contract. With what term of the contract had LMIS not complied? According to the DCAA, LMIS had violated FAR 42.202, "Assignment of contract administration," subparagraph (e)(2), which states: "The prime contractor is responsible for managing its subcontractors." According to the DCAA: "Since the prime contractor did not properly manage its subcontracts in accordance with the FAR, we questioned the cost accordingly."

What had LMIS failed to do? According to the DCAA:

> The prime contractor is in noncompliance with FAR 42.202, Assignment of Contract Administration, Paragraph (e), Subsection (2) which states, "The prime contractor is responsible for managing its subcontractors." Since the prime contractor did not properly manage its subcontracts in accordance with the FAR, we questioned the cost accordingly. The contractor failed to maintain necessary documents to substantiate they reviewed (i) résumés to assure for compliance with contract terms, and (ii) timesheets to assure the number of hours invoiced were supported.

> Further, the contractor did not provide any records demonstrating that they attempted to cause the subcontractor to prepare an adequate submission or any requests to the Government for assistance if the subcontractor refused. A literal interpretation of FAR 42.202 requires the prime contractor to act on behalf of the Government and serve as both the Contracting Officer (CO) and the Contracting Administrative Office (CAO) for each subcontract that it awards under a Government flexibly priced contract. This includes the requirement for the prime contractor to audit their subcontracts or request audit assistance from the cognizant DCAA office when the subcontractor denies the prime contractor access to their records based on the confidentiality of propriety [sic] data.

The DCAA sought a response from LMIS, which rejected the DCAA's findings and refused to concede that the subcontract costs were unallowable.

The CR2 and S3 Contracting Officers ultimately issued final decisions on 14 and 15 August 2014 demanding repayment of $102,294,891 against the CR2 contract and $14,494,740 against the S3 contract. In the decision pertaining to the CR2 contract, the final decision stated:

> Federal Acquisition Regulation (FAR) 42.202(e)(2) states: "The prime contractor is responsible for managing its subcontractors." The audit and work of the auditor determined that LMIS did not properly maintain oversight of

APP_002

subcontractors including monthly reviews of costs incurred. This is a breach of the contractor's duty of performance. It was found that 46 subcontractors did not submit an adequate incurred cost to LMIS (prime contractor). In addition, LMIS did not audit, or request audit assistance from DCAA, on their subcontractors as a prime contractor must do under this contract type.

> Additionally, there are differences between the prime contractor proposed amounts and the amounts claimed elsewhere. Added to this are the assist audit reports on 29 subcontractors where costs are questioned by DCAA. This office has read the responses in the exit interview and concurs with the DCAA answers to the prime contractor's responses. This final decision is based on audits conducted by DCAA during its audit of costs charged to the contract and underlying task orders during Fiscal Year 2007.

The decision pertaining to the S3 contract stated:

> DCAA Audit Report 6341-2007A10100043 dated 14 May 2014, had findings against the S3 program of $978,026 in questioned costs and $13,516,714 in unresolved costs. Individual orders were listed in the audit. The questioned amounts represent costs claimed at the subcontractor level, inclusive of labor.

> Based on the foregoing, it is my decision that Lockheed Martin Integrated Systems (LMIS) is indebted to the United States of America….

(We found no explanation for the differences between the amounts in the audit findings and in the Government's claims.) According to the board, those were the only justifications given for the decisions. LMIS filed two appeals and the board ordered the Government to file the complaints, which the board consolidated. LMIS filed motions to dismiss with prejudice based on failure to state claims upon which relief can be granted.

The board rejected the Government's claims and granted LMIS's motions to dismiss with prejudice. According to the board:

> Notably, nowhere in either complaint or COFD does the government cite to a contract term giving rise to a contractual obligation or duty. As the government conceded in its briefs, FAR 42.202 is not a term of the contract.

Our inquiry does not end there, however. The government asserts for the first time in its briefs that there exists an implied contractual duty for a prime contractor to manage its subcontracts: The government did not allege that FAR 42.202-2(e)(2) is in the contract and appellant breached the contract, rather that appellant breached its inherent duty to properly manage its subcontracts, which led to the government paying for unallowable costs." In that one sentence, the government summarizes the essence of its claim, which is that LMIS's breach of a contractual duty to manage its subcontractors led it to breach the contract by submitting claims for subcontract costs that were unallowable because LMIS breached its contractual duty to manage its subcontractors. Thus, *ipso facto*, if LMIS did not breach a duty to manage its subcontractors, it did not submit unallowable costs for payment, and if it did not submit unallowable costs for payment, it did not breach the contract.

We now turn to the duty that LMIS is alleged to have breached. Even though the government has conceded that FAR 42.202 is not a term of the contract, we find it to be relevant to this inquiry because the audit report, the COFDs, and the complaints (in other words, 100 percent of the documents that articulate the government's claim in both appeals), all rely on FAR 42.202 in describing the duty that LMIS allegedly breached. [Footnote omitted.]

The board then went on to hold that FAR 42.202 did not require LMIS to do any of the things the DCAA and the COs complained it had not done.

We hold that the government's claim for "subcontractor costs at the prime contractor level" fails to allege a valid duty or obligation on the part of LMIS that arises from either the CR2 or the S3 contract, either express or implied, and therefore fails to state a claim for relief that is "plausible on its face." Whether the government's claim is characterized as one for breach of contract or for improperly billed unallowable costs, it depends on the government's assertion of a valid contractual duty that was breached by LMIS. In this case, we are presented with a claim based on a legal theory, originated by an auditor, that LMIS, as a prime contractor, had a contractual duty to retain for purposes of an incurred cost audit the same documentation that it used to substantiate its billings during the course of performance of the contract and, moreover, had a duty to initiate audits of its subcontractors' incurred costs and be able to prove during the course of an incurred cost audit that it did so.

LMIS's "breach" of these non-existent duties is the government's only basis for asserting that the subcontract costs for which it has reimbursed LMIS are

unallowable costs. The government does not allege that LMIS did not adequately substantiate its billings during performance of the contract, or that the subcontract services were not provided to its satisfaction, or that the costs billed were not incurred by LMIS. Rather, it has gone forward with a claim for over $100,000,000 that is based on nothing more than a plainly invalid legal theory. LMIS's "breach" of these non-existent duties is the government's only basis for asserting that the subcontract costs for which it has reimbursed LMIS are unallowable costs. The government does not allege that LMIS did not adequately substantiate its billings during performance of the contract, or that the subcontract services were not provided to its satisfaction, or that the costs billed were not incurred by LMIS. Rather, it has gone forward with a claim for over $100,000,000 that is based on nothing more than a plainly invalid legal theory.

"A plainly invalid legal theory"—how could COs and the Army's lawyer have asserted such obviously baseless and foolish claims? We are not really surprised by this case, because in the course of our teaching we have been startled by the number of acquisition personnel in both Government and industry, including personnel with long experience, who believe that the FAR is contractually binding. We have met many such personnel who also believe that their contracts are "automatically" updated when the FAR councils update a FAR contract clause. Those beliefs are false.

**The Relationship Between The FAR And Contracts**

The FAR and its agency supplements prescribe policies and procedures with which Government personnel must comply and the forms that they must use when conducting acquisitions. See FAR 1.101: "The Federal Acquisition Regulations System is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies." See also FAR 2.101: "'Acquisition' means the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease…."

Nothing in the FAR indicates that the FAR is contractually binding or incorporated into contracts as a whole. When the Government wants to obligate a contractor to comply with a FAR policy or procedure, the FAR prescribes appropriate contract clauses to that effect. For example, FAR 2.101, "Definitions," states official definitions of 249 words and terms. There are hundreds more official definitions in other FAR parts, subparts, and sections. In order to require contractors to accept those definitions FAR 2.201, "Contract clause," directs COs to insert FAR 52.202-1, "Definitions (NOV 2013)," into all contracts that exceed the simplified acquisition threshold. In another example, FAR 15.408(d) and (e) require COs to insert the clause at either FAR 52.215-12 or 52.215-13 into contracts that include the clause at FAR 52.215-10 in order to require contractors to obtain certified cost or pricing data from their subcontractors in accordance with FAR 15.403-4(a)(1). Some FAR contract clauses effectively incorporate an

entire FAR subpart or section into a contract by reference. See, for example, FAR 52.216-7, "Allowable Cost and Payment (JUNE 2013)," which conditions contract cost allowability on FAR Subpart 31.2 as in effect on the date of the contract. This pattern—statement of policy or procedure followed by clause prescription—recurs throughout the FAR.

In the LMIS case, the phrase "the contractor shall" or "the contractor must" does not appear anywhere in FAR 42.202(e)(2), and FAR Subpart 42.2, "Contract Administration Responsibilities," prescribes no contract clause to implement its provisions. The statement in FAR 42.202(e)(2) on which the COs and the DCAA relied, "The prime contractor is responsible for managing its subcontracts" is factually debatable as a practical matter. The Government is sometimes very intrusive in that regard. See FAR 15.404-3, "Subcontract pricing considerations." FAR 42.202(e)(2) actually provides for Government contract administration office involvement with subcontractors under certain conditions. Need there be privity between the Government and a subcontractor before the Government can "manage" some aspect of a subcontractor's performance? What constitutes "managing" a subcontract?

The rule is simple: In order for a contractor to be obligated to act or refrain from acting in a specified way pursuant to FAR, the contract must plainly say so. It must include a term to that effect, such as a specification or a contract clause.

**The *Christian* Doctrine**

What about the *Christian* doctrine, which is based on based on the holdings in *G.L. Christian & Associates v. U.S.*, 160 Ct. Cl. 1, 312 F.2d 418, *reh'g denied*, 160 Ct. Cl. 58, 320 F.2d 345, *cert. denied*, 375 U.S. 954 (1963)? Doesn't the FAR have the force and effect of law? Doesn't the Christian doctrine stand for the proposition that a contractor must comply with the FAR whether or not there is a clause in the contract to that effect? No. The *Christian* doctrine stands for the proposition that COs have only the authority delegated to them, that COs may not omit mandatory contract clauses that implement important policies unless they obtain authorization, and that firms that want to do business with the Government are assumed to know the limitations on CO authority. Thus, a court or board will interpret a contract as if such an improperly omitted clause is included, based on the legal assumption that the contractor knew or should have known that the clause was part of the deal. The *Christian* doctrine actually reinforces our simple rule that a contract must specify an obligation in order for a contractor to be obligated, because it serves to mandate the incorporation of such requirements when they have been improperly omitted.

In *Space Gateway Support*, LLC, ASBCA 55608, 13 BCA ¶ 35232, 2013 WL 518974, one judge attempted to expand the Christian doctrine to apply not just to omitted contract clauses, but to other provisions of the FAR as well. The FAR provision in question, which was removed in 2007, stated "[n]o profit or fee shall be allowed on the cost of facilities when purchased for the account of the Government under other than a facilities contract." The contractor wanted

APP_006

such profit or fee notwithstanding and submitted a claim. The judge opined that the prohibition was incorporated into the contract by operation of law:

> While *Christian* involved a standard clause which was mandated by "regulation" be included in certain government contracts, *G.L. Christian*, 160 Ct. Cl. at 12, 312 F.2d at 423, application of the *Christian* doctrine does not depend upon whether there has been an "intentional or inadvertent omission of a mandatory contract clause," but upon "whether procurement policies are being avoided or evaded (deliberately or negligently) by lesser officials."

The other judges who signed the decision concurred with the result but not with the reasoning, and we have found no agreement with *Space Gateway* in any other decision by a court or board. See Johnson and Snyder, *Case Note: Space Gateway Support LLC*, 8 No. 2 COSTS, PRICING & ACCOUNTING REP. NL ¶ 11, and *Profit in Equitable Adjustments: An Unusual Dispute*, 27 N&CR ¶ 16.

**Conclusion**

The COs in this case erred by going along with the DCAA's legal theorizing and in relying on it as the basis for their final decisions. The COs' first reactions to the reports from the auditors should have been to tell them to stick to the facts and leave theorizing to competent professionals.

We read chastisement in the board's statements that "we are presented with a claim based on a legal theory, originated by an auditor…." and "[the Government] has gone forward with a claim for over $100,000,000 that is based on nothing more than a plainly invalid legal theory." Ouch. In signing final decisions based entirely on the DCAA's half-baked legal theorizing the COs in this case abdicated their responsibility under the Contract Disputes Act and behaved like intimidated clerks. Just as horrifying was their ignorance of the FAR—its legal standing and its content. *VJE*

**ADDENDUM** • Vern properly criticizes the COs for not carrying out their responsibility under the CDA to render an independent decision. But what about the Government lawyers? It seems rather obvious that if you can't state a viable legal theory, you should not litigate a claim. We don't know whether pursuing this claim was based on lack of legal competence or lack of willingness to inform the agency head that there was no basis for the claim (and it therefore should be dropped). Neither possibility reflects well on the agency lawyers. *RCN*

Westlaw. © 2017 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**End of Document**         © 2017 Thomson Reuters. No claim to original U.S. Government Works.